John B. Hayes, plaintiff in error, *vs.* The State of Georgia, defendant in error.

1. Indictment not quashed because two of the grand jurors, Seaborn Watford and John W. Stoy, were on the jury list of the county as S. Wadford and John W. Stoy, Jr. Grand jury presumed to be legally constituted, where names so nearly correspond, and where there is no decisive evidence that the persons who actually served were not the individuals designated by the commissioners as qualified.

2. Arraignment need not be repeated after mistrial, in order to try again on the same issue.

3. The judge, when too much exhausted to proceed with a night session, may suspend till next morning, though he had announced that there would be no stop till the trial was over.

4. Where the killing is admitted, the court may so state in charging the jury. The rule as to manslaughter, and some other parts of the charge given, were more favorable to the prisoner than the exact law.

5. Several grounds of the motion for new trial were so free from error as to admit of no question.

6. The charge should contain no allusion to the reviewing powers of the supreme court as a resource to the prisoner.

7. Intentionally killing, with a deadly weapon, a mere trespasser upon property, is generally murder and not manslaughter.

8. Where there is any evidence from which the jury might infer that the weapon used was provided beforehand for the purpose of killing the deceased, it is not error to charge, that so providing it would be

evidence of malice, the case, on any possible view, not being one of justifiable homicide.

9. The jury are to decide for themselves what facts are established, and what conclusions, under the law, result from them. The mental convictions of the judge, in respect to the facts, should neither be declared nor intimated. His manner of charging should not be argumentative. The purpose of the charge is to state and explain the law, not to carry on a process of general reasoning.

10. In arriving at intention, some regard should be had to what transpired *at* the killing, not placing the whole stress on what occurred before and after. Matter in the charge, argumentative in part, and in part irrelevant, is objectionable.

11. The charge should not characterize the deceased as a "victim;" nor should it declare the prisoner "guilty of murder" if certain matters of fact be not true.

12. In the trial of a capital case, especially during the examination of a witness for the state, the judge should not retire beyond the bar, for even a brief absence, without ordering a suspension of business until his return.

13. The guilty and the innocent are alike entitled to be tried according to law, in the immediate presence of one of the state's judges, and with no material error in the charge of the court.

See concurring opinion of JACKSON, Judge.

Criminal law. Indictment. Jury. Practice in the Superior Court. Arraignment. Charge of Court. Before Judge GIBSON. Richmond Superior Court. April Adjourned Term, 1876.

At the April term, 1875, of Richmond superior court, Hayes was placed on trial for the murder of Henry Key. Before the defendant pleaded, he moved to quash the indictment upon the ground that the names of two of the grand jurors who found it, were not on the jury list of the county, to-wit: John W. Stoy and Seaborn Watford. The jury list being produced showed no such names, but did contain the names of S. Wadford and John W. Stoy, Jr. The sheriff testified that he knew no one in the county named Watford or Wadford except Seaborn Watford, who served on the grand jury which found the indictment; that John W. Stoy, Jr., also served on the same jury, and no other Stoy did so

serve; that there was another John W. Stoy living in the county at the time the indictment was found, but he has since died. The motion was overruled, and the defendant excepted. The exception was certified and entered of record.

The defendant was then arraigned and pleaded not guilty. The case proceeded and resulted in a mistrial.

The case came on again to be heard at the April term, 1876, when the jury found the defendant guilty. The rulings complained of will be clearly presented by the motion for a new trial, and the facts developed by the testimony. The case made by the prosecution was, in substance, as follows:

About 6½ o'clock on the evening of January 23, 1874, the deceased was shot by the defendant in the yard of the Charlotte, Columbia and Augusta Railroad Company. The defendant was arrested, and, on being asked why he shot deceased, stated that the latter had cursed him for a damned son of a bitch, and that he had been abused by parties coming in the yard as much as he intended to be, and he was going to put a stop to it. He also stated that deceased had a piece of wood going out of the yard with it, and he told him he could not carry it out, and deceased laid it down; that he then went about his business; that afterwards he again met deceased with the piece of wood, carrying it out of the yard, and he told him that he could not take it off, or something to that effect; that deceased said he would carry it off, and some words ensued in regard to the wood, when deceased told him to kiss his behind; that he then shot him, and would shoot any other man who would tell him the same thing. Defendant was the night-watchman at the railroad yard. It was customary and proper for night-watchmen to be armed. Deceased was a man that had many difficulties; he frequently became drunk and had fights. When sober, he was peaceable. The wood, about which the controversy arose, was an old piece of scantling, about four feet long, worth very little. It had been given to deceased by a section boss in the employ of the railroad, on the afternoon of the day preceding that on which the homicide was committed. It had been placed in-

side of, and behind, the gate of the yard, for him. It was the property of the railroad company. It was the habit of the section boss to give away such old timber as was of no use to the road. Deceased, when shot, did not have the appearance of a man that had been drinking. Some one in the crowd, which gathered around the deceased when he was shot, before defendant left, said it was a shame to shoot a man down like a damned dog, when defendant said, "if you will hold him up, God damn you, I will shoot him down again." He also said, "I told you last night to keep out of here, and I reckon, God damn you, you will stay out now." Deceased was also in the employ of the railroad company as a cotton clerk. In his dying declarations, he stated that at about 6½ o'clock on the evening of January 23, 1874, he went to close his cotton-gates; that after doing this, he picked up a piece of scantling wood that was given him on the day before by the section boss; that defendant saw him, and halloed out to him in a very rough manner, that it was against the rules of the yard to be taking wood out; that he replied that it had been given him by the section-master, and was not the company's wood; that he then told deceased that he should not take it out, to which the latter replied that he would be damned if he didn't; that deceased did not see defendant draw his pistol, but saw the flash of it; that he thought at the time that defendant had killed him; that he was unarmed.

The yard was open at the place where deceased was shot; there was no gate there then; it has been since erected. (It is supposed that the front gate is here alluded to, and not the cotton gates.)

Mr. R. H. Wylly, a former agent of the railroad company, at Augusta, testified for the defense, that defendant was the night-watchman at the railroad yard, and when on duty, had charge of the entire premises; that he had specially instructed him not to allow any wood taken out of the yard; that the hands were in the habit of carrying off wood belonging to the company, to such an extent that he was compelled to put a stop to it; that he instructed defendant

to allow none of the employees to carry any wood out of the yard without witness' permission; that no subordinate had authority to give permission to any one to take out wood; that witness was aware of the fact that defendant went armed, but had not instructed him to arm himself; that it was the watchman's duty to shut the gates; that witness was not agent of the company at the time of the shooting; that he gave defendant no instructions to shoot persons carrying off wood, but expected him to arrest them and put a stop to it.

Charles W. Sheron testified that on the evening of the day of the homicide, deceased was a good deal under the influence of liquor; that he had that appearance.

The defendant moved for a new trial on the following grounds:

1. Because the verdict was contrary to law.

2. Because the verdict was contrary to evidence.

3. Because the verdict was contrary to law and evidence.

4. Because, after the indictment was read to the jury, counsel for prisoner, having called the attention of the court to the following facts, that there had formerly been a mistrial in this case, that the present was a trial *de novo*, that in the present trial there had been no arraignment of the prisoner, that the prisoner had not, in this trial, been called on to plead, and that there was, therefore, no issue formed between the state and the accused, objected to the introduction of any evidence before issue thus formed, and the objection was overruled by the court.

5. Because the court refused to give in charge the following request:

"If the prisoner fired even rashly to prevent the deceased from committing a trespass, or what he reasonably conceived to be a trespass, he would be guilty of no greater crime than manslaughter."

6. Because the court refused to give in charge the following request:

"If one kills another under the fears of a reasonable man

that the deceased was manifestly intending to commit a felony on his property, it is justifiable homicide; if under such fears of an injury less than felony, it is not murder but manslaughter."

7. Because the court refused to give in charge the following request:

"If the jury believe, from the evidence in the case, that there was no intention on the part of Hayes to take the life of Key, but that he was actuated by a sense of duty in carrying out the orders he had received from the superintendent of the company in preventing any property of the company from being taken out of the company's yard, and that, in the performance of this duty, he fired rashly and indiscreetly, and the death of Key resulted, then the jury should find him guilty of involuntary manslaughter. Involuntary manslaughter is of two kinds, either in the commission of an unlawful act, or a lawful act without due care and circumspection."

8. Because the court, after remarking to the jury in his general charge, that while it is your privilege and duty to interpret the law and the facts, you can commit no great error to receive from the court its interpretation of the law. I have no interest except the good of society and the performance of my duty, added the following language: "If I make a mistake as to the law, there is a reviewing court, it will correct it."

9th. Because the court refused to give in charge the following request:

"The possession of the pistol by Hayes, he being a watchman, is not a circumstance from which malice can be implied, and to presume malice, from the circumstances, it would be necessary to show that he had provided himself with it for the purpose of making the attack" but in response to said request, remarking "the fourth request to charge, that counsel for the prisoner have presented, I give with this in addition: the possession of the pistol by him is not a circumstance from which malice can be implied,

and to presume malice is wrong. It would be necessary to show that he had provided himself with it for the purpose of killing Key, and this you are to judge from the evidence, then it would be evidence of malice," no testimony whatever having been offered tending to show that Hayes had provided himself with the pistol for the purpose of killing Key.

10th. Because the court charged the jury as follows: "Well, did he deliberately intend to do it?" Was there any circumstance to show he had prepared himself to stop people from trespassing in the yard, that he got a pistol, loaded it with a ball, prepared himself for the emergency, and that he had previously, or afterwards, said he was going to stop it? If that was the evidence, what more deliberation can a man have? You are bothered, troubled, and you commit an act, and you say afterwards you have stood that thing as long as you are going to. These are facts from which a deliberate intention may be inferred."

11th. Because the court, after reading the 4322d section of the Code of Georgia, charged the jury as follows: "All the circumstances must be considered. If the purpose, on the part of the slayer, to take human life, shows an abandoned and malignant heart, from that you may infer malice. Is the killing, in this case, murder? Can it be said to be manslaughter; that is, without malice or deliberation?"

12th. Because the court charged the jury in the following language: "No amount of words, insults, or threats, will reduce this from murder to manslaughter, no matter how insulting; no trespass he could commit, or attempt to commit, would reduce it to manslaughter. One of the best reasons is the law to punish trespass, as passed in 1866. When you have a law, you can't punish it yourself, for the law is the arbiter for all law-abiding citizens; those persons who take a gun or knife and attempt to execute their purposes, must meet the consequences of their folly."

13th. Because, after reading the 4327th section of the Code, the court added: "That is when there is no intention to take

life, or when you shoot at one man and hit another; when you shoot at the foot of a man and hit his head and kill him, can the jury say that he did not intend to kill him?"

14th. Because the court charged the jury as follows: "In this case the killing is admitted, so I can treat it as uncontradicted and as a fact. Was Hayes then in the discharge of his duty? If he felt at that time that he was in the discharge of his duty, and that a trespass was being committed, his passion was aroused, and, under the impulse of that passion, he killed Key, then you are at liberty to call it manslaughter."

15th. Because the court charged the jury as follows: "See if there was any preparation, purpose, or deliberate intention; gather it from the facts before and after. What kind of a duty can a man feel he was performing to take human life? In defense of person, or habitation, or as an officer of the law? Consider what was the conduct after the shooting; was he mad or excited? what was he doing? how was he acting? how behaving? how did he conduct himself immediately after the affair?"

16th. Because the court refused to quash the indictment on the ground moved for by the defendant's counsel, that said indictment was not found by a legal grand jury, there being on said jury two illegal jurors.

17th. Because, during the examination of the witness, W. W. King, the judge was off the bench and outside the bar.

18th. Because, during the argument of counsel on both sides, at different times, the judge was off the bench and absent from the court-room.

19th. Because the judge, after announcing that the case would be finished without adjournment, at the close of the concluding argument for prisoner, about two o'clock in the morning, adjourned the court until next day, when the concluding argument for the state was made.

20th. Because the court erred in charging the jury, as follows: "Consider what was the conduct after the shoot-

Hayes *vs.* The State.

ing; was he mad? was he excited? what was he doing? How was he acting? how behaving? how did he conduct himself immediately afterwards, as the deceased lay before him a victim? Consider all this; what was his conduct? what did he say afterwards? All these are for you to consider, whether it was deliberate murder, or the act of a conscientious man discharging his duty, excited? If it was, you will regard it; otherwise, he was guilty of murder."

The court overruled the motion in the following judgment:

" The first jury impaneled to try said cause failed to agree upon a verdict, and a mistrial was ordered, which may account for the seeming inattention of the presiding judge at times. A convenient and necessary retreat being in the hall of the court-house, without delaying the examination of witnesses, or the speeches of learned counsel when addressing the jury, I occasionally, to ease myself, visited the retreat, and may have spoken with some friends in both going and coming relative to other business of the court, myself or others. If the learned counsel had objected to Mr. King's evidence, I am confident the counsel for the state would have desisted until my return into the court-room. His testimony was not objectionable until he reached the point when he ordered the prisoner to shut up; this being only a portion of the prisoner's statement, was ruled out, and hence any absence at the time complained of was harmless.

" The speaking in the case commenced, if my recollection serves me correctly, soon after dinner, making near *eighteen hours* for speaking, which I had reasonably calculated was sufficient, from what had been before consumed in speaking, hence I announced that I would go through with it that night; however, about half past one, my strength and resolution both failed, and I informed Mr. Foster I could not, that night, hear his speech. He insisted on going on that night with his reply to Mr. Black's speech, which had been both able and exhaustive; and even remarked to me

that such was his anxiety, that if I did not permit him to then speak, I might go on and charge the jury, thus giving up the conclusion. I remarked to him that I did not then feel able and could not charge the jury even, and at the conclusion of Mr. Black's speech, adjourned the court until next morning, in both of which acts complained of by the learned counsel, I feel perfectly conscious that no injury was done the cause of the prisoner, and I know none was either intended or thought of. Having heard the entire evidence, with the speeches of learned counsel on a former trial, I did not feel it my duty to pay as close attention as if it had not been tried at a former term of this court before me, hence these grounds for a new trial are overruled.

"If the deliberate, cool, killing a fellow-employee for an attempt to carry off a short piece of wood, sawed from the end of a post that day placed in the ground, be not murder, there are few cases of murder. All the circumstances of the killing, before the shooting, at the time of the killing, and immediately after, show coolness, deliberation, and an indifference for human life seldom, if ever, equaled. Hence this motion on all the grounds charging the verdict to be contrary to law and evidence, or the charge of the court, are overruled and refused.

"The only charge I made is contained in exhibit attached to the motion made by learned counsel. It may seem incorrect to persons or a court looking for grounds of escaping the penalties of crime; yet, after full reflection and thought, as well as examination, I am satisfied it is correct, and as good as I can make it for the prisoner, and, therefore, all of the alleged grounds of error as to charges and refusals to charge, and additions to requests, are overruled and refused.

"As to the name of the juror, Seaborn Wadford, as found in the indictment, I hold therein upon the evidence submitted in the jury list, that of S. Watford being contained therein, and of the sheriff, who is a native of this county, and has now been sheriff for two or more successive terms, that he knew of no other Wadford than Seaborn Wadford in this county,

that it is sufficiently certain Seaborn Watford is the man who is on the jury list as S. Wadford; and the same may be said of John W. Stoy, there being a junior and senior John W. Stoy in this county—John W. Stoy being on the jury list as John W. Stoy, Jr., and as John W. Stoy only, in the indictment, both names, however, representing the same man, it being as matter of fact and proof that John W. Stoy, Jr., did serve on the grand jury the term the bill was found.    Therefore this ground of error is overruled and refused.

"The prisoner having been formally arraigned on his former trial, and his arraignment entered on the minutes, I did not consider a second arraignment necessary.    I therefore overruled this ground, and all others made for a new trial with, however, *great distrust and sincere regrets*, trusting that some lawful provision may be had or made by which the unfortunate man may escape the death penalty of the law."

To this judgment the defendant excepted.

Barnes & Cumming; J. C. C. Black, for plaintiff in error.

Salem Dutcher, solicitor general, for the state.

Bleckley, Judge.

1. The indictment will not be quashed because the names of two of the grand jurors varied thus: the jury list had on it the name of S. Wadford; the indictment contained the name of Seaborn Watford; the jury list had on it the name of John W. Stoy, Jr., and the indictment contained the name of John W. Stoy.    When the names so nearly correspond, and there is no decisive evidence showing that the persons who actually served as jurors, were not the individuals designated by the commissioners, and registered on the list as competent to serve, the presumption is that the grand jury was legally constituted.

2. When the prisoner has been arraigned and has pleaded not guilty, an issue is formed, and the same remains an issue

until the plea is withdrawn, or until the indictment is disposed of. If, after a verdict of guilty, a new trial be had, the new trial may take place without a second arraignment. 49 *Ga.*, 103. So, if a mistrial be declared, it is not necessary to re-arraign the prisoner in order to put him again on trial.

3. When the judge has become exhausted by a late night session, he may and should adjourn over until next day, though he had previously announced that he would conclude the trial that night, and counsel for defendant have made their final argument with that expectation, and though the concluding argument for the state be thus postponed until the solicitor has had the benefit of rest. There is no law which requires a court to disregard the necessary physical conditions of efficient labor.

4. Where the killing is admitted, the court may say so. See 56 *Ga.*, 365. The complaint that the rule given in the 14th ground of motion for new trial, touching manslaughter, is less favorable to the prisoner than it should be, is wholly unfounded. It seems more favorable to him than the true law of the case would warrant; and the same may be said of some other parts of the charge set out in the record.

5. Under the facts in evidence, the 6th, 7th, 11th and 13th grounds of the motion for new trial, are so obviously free from error as to require no more than bare mention. The 5th and 12th grounds are disposed of by what is ruled on the subject of trespass.

6. As the jury have no concern with the reviewing powers of the supreme court, any reference to the same by the presiding judge, in his charge, on the law of a criminal case, even if not positive error, should be omitted. 5 *Ga.* 138–9; 8 *Ib.* 267; 11 *Ib.* 57; 15 *Ib.* 121, 122; 22 *Ib.* 212.

7. To intentionally kill, with a deadly weapon, one who is committing a trespass upon property, is generally murder, and not manslaughter. Wharton on Homicide, §414. No exception to this general rule is involved in the present case, the trespass, if any, being the appropriation and removal of

a small piece of timber of trifling value. What is said in 5 *Ga.* 86, and 18 *Ib.* 194, refers to trespass affecting the person, and not to trespass affecting the goods only.

8. The defendant having requested a charge on the subject of preparing the weapon, it was not error for the court, after giving the matter requested, to add, that the jury were to judge from the evidence whether the prisoner provided himself with the weapon for the purpose of killing the deceased, and that doing so would be evidence of malice. This addition was not wholly without evidence to warrant it. Although the prisoner was a watchman at a railroad depot, and committed the homicide while on duty; and although, under the evidence, it was usual, and not improper, for railroad watchmen to go armed, yet, as there was no direct evidence that the prisoner had ever been armed while on duty before the occasion of this shooting, and as it did not affirmatively appear when, where, or for what purpose, he procured the pistol, and as there was some evidence tending to show that certain expressions escaped him shortly after the shooting, which indicated that the thought of dealing with the deceased as a trespasser was not altogether new to him, the jury were at liberty to consider whether, from all the circumstances, he had the pistol as a part of his ordinary equipment as watchman, or whether he procured and prepared it with special reference to using it as he did use it—that is, shooting the deceased with it in case the latter should attempt to carry wood from the yard and not desist when ordered.

It should be added that, generally, the court cannot instruct the jury that one thing is evidence of another, for this is to reason or infer, which is work appropriate to the box and not to the bench. But as respects the conclusion of malice from the preparation and use of a deadly weapon, it has long ago become a rule of law; and because it is such a rule, the court may give it in charge, not solely because it is sound reasoning or good logic. Originally, perhaps, it was but the latter, and while it so continued a more reserved method of charging on it may have prevailed. A still further

observation proper to be made is, that the application of the rule to the present case is not made doubtful by any element of justifiable homicide in the evidence.

9. The charge to the jury, in a criminal case, should state and explain the law, but should contain no argument whatever upon the facts. The tribunal of inference is the jury, and the jury alone. Not only are they to judge what facts are established, but they are to draw their own conclusions from them, under the law, uninfluenced by any impressions which may have been made by the testimony upon the mind of the judge. His convictions should neither be declared nor intimated. He should state that the law implies malice from the preparation and use of a deadly weapon, but to proceed in the *argumentative* manner following, is manifest error:

"Well, did he deliberately intend to do it? Was there any circumstance to show he had prepared himself to stop people from trespassing on the yard? That he had got a pistol, loaded it with ball, prepared himself for the emergency, and that he had previously or afterwards said he was going to stop it? If that was the evidence, *what more deliberation can a man have?* You are bothered, troubled, and you commit an act, and you say afterwards, you have stood that thing as long as you are going to. *These are facts* from which a deliberate intention may be inferred."

This charge is the more objectionable, because some of the facts enumerated are not found in the evidence—certainly not in the distinct and definite form in which they are here presented.

10. In the fifteenth ground of the motion for new trial there is objectionable matter. In arriving at intention, regard should be had to what transpired *at* the killing, as well as before and after. The following passage should have been omitted as partly argumentative and partly irrelevant: "What kind of a duty can a man feel he was performing to take human life? In defense of person, habitation, or as an officer of law."

11. In charging the jury, the court should not ask, "How did he conduct himself afterwards, as the deceased lay before him, *a victim ?* " The use of the word victim is not favorable to cool and dispassionate trial. Nor should the court decide for the jury, so far as to say to them that if certain facts be not true, the prisoner " is guilty of murder." See the twentieth ground for new trial in the reporter's statement.

12. When, during the trial of a capital case, the judge leaves the bench and withdraws beyond the bar, he should order a suspension of business until his return. His immediate presence tends to preserve the legal solemnity and security of trial, and upholds the majesty of law. Especially, while a witness for the state is under examination, should the judge not retire beyond the bar, without directing the examination to cease during his temporary absence, however necessary or however brief his absence may be.

13. The guilty and the innocent are alike entitled to be tried according to law, in the immediate presence of one of the state's judges, and with no material error in the charge of the court. Because the prisoner has not been thus tried he is, as matter of right, entitled to a new trial, whatever may be the degree of his guilt.

Judgment reversed.

JACKSON, Judge, concurring.

Whilst I do not give my assent to all the criticisms upon the charge of the presiding judge made in the opinion of the majority of the court, and think that the charge, taken as a whole, including the requests given, is fair, if not favorable to the prisoner, yet in view of the fact that the presiding judge left the bench without suspending the trial, and was outside of the court-room pending the examination of a witness and the argument, and that the judge made allusion in the charge to the deceased as the prisoner's "*victim,*" and on the vital point of deliberation in the act

of shooting, after enumerating certain facts, asked the question, "What more deliberation could a man show?" or words to that effect, I concur in the judgment that it is better to grant a new trial even in a case like this.