## CRAWFORD *v.* THE STATE.

1. To constitute robbery, there must be force or intimidation, asportation without the consent of the owner, and the intent to steal. A person taking property from another under a *bona fide* claim of right and with the purpose of applying it to the payment of a debt from the latter to himself, is not guilty of robbery. In such case the *animus furandi* is lacking. It is otherwise if the claim of right is a mere pretence.

(*a*) Under the evidence in this case, the court should have submitted to the jury the question whether the claim of right made by the deceased was *bona fide* or a mere pretence accompanying an intent to steal.

2. To constitute robbery, it is unnecessary that the taking of the property should be directly from one's person; it is sufficient if it is taken while in his possession and immediate presence.

3. If a trespass on the person or property of another amounts to a. felony, the killing of the trespasser will be justifiable if necessary in order to prevent it; but a trespass which amounts only to a misdemeanor will not justify the killing. Where, therefore, a person stopped in the highway the wagon which another was driving and took from it certain meat of the other for the declared purpose of settling a debt which he claimed was due him by the

owner, and while proceeding with his pocket-knife to cut off enough of the meat to pay the debt, the owner sought to prevent him, and the trespasser cut at him with his knife to prevent interference, and the owner thereupon seized a fence-rail, a deadly weapon, and without necessity struck the trespasser on the head, thereby causing death, the homicide was not justifiable if the claim of debt was made in good faith and there was no intent to steal, but was manslaughter. If the blow was to prevent robbery and was necessary for that purpose, the homicide was justifiable.

4. It is questionable whether the construction placed upon section 4332 of the code in *Pound* v. *The State*, 43 *Ga.* 127, by LOCHRANE, C. J., *arguendo*, is correct as to the property contemplated being only such as is at or near the habitation; but whether so or not, the section has no application where the injury intended is not a felony and the property attacked or invaded is so inconsiderable that the injury threatened is not serious, but slight, such as sever-ing from a side of meat a small part of it.

January 17, 1893.

Criminal law. Murder. Manslaughter. Robbery. Before Judge BOWER. Dougherty superior court. October term, 1892.

J. W. WALTERS, by HARRISON & PEEPLES, for plaintiff in error.

J. M. TERRELL, attorney-general, and W. N. SPENCE, solicitor-general, by brief, *contra.*

SIMMONS, Justice.

Crawford was found guilty of murder; his motion for a new trial was overruled, and he excepted. It appeared from the evidence that while the defendant was driving his wagon along the highway, the deceased drove up behind in a buggy, whipping his horse and holloaing, and upon being asked by another person present whether he was drunk, and what was the matter with him, answered, " No, by G–d, I am not drunk; Warren [the defendant] treated me wrong in town." The defendant and the deceased quarreled for awhile, but finally desisted; and when they got to a certain point in the road, where the deceased stopped, one of the party proposed to the defendant that they should

drive on ahead, so that the deceased would not catch up with them ; and they did so ; but the deceased soon overtook them, jumped out of his buggy, ran around to the front of the defendant's wagon, calling to him, " G–d damn it, stop your mules and take my things out," and caught hold of the lines and stopped the mules himself. The " things " referred to by the deceased were articles he had hired the defendant to carry for him in the wagon. The defendant handed them to the deceased, and the latter, after putting them down, stepped to the wagon and took out a piece of meat weighing several pounds, which belonged to the defendant, and threw it on the ground with his own things. The defendant said, " By G–d, what does that mean ?" The deceased replied that he was going to have a quarter's worth of the meat, and that the defendant owed him a quarter. The defendant said he did not have the money then, but would pay it when they reached his house if the deceased would wait until they got there. One of the party said he would pay the money for the defendant himself, but the deceased refused to wait or to take the money offered him, and insisted that he was going to take enough of the defendant's meat to pay himself. The defendant begged him not to do so, saying that he had to carry it home to live on, and that if deceased persisted in taking it he would hurt him. The deceased·paid no attention to the protests of the defendant, but began cutting the .meat. The defendant attempted repeatedly to snatch the meat away from him or to push him off from it, but each time he attempted to do so, the deceased " raked " or cut at him with his knife, and began again to cut the meat. After the defendant's last attempt to get the meat away from the deceased in this manner had proved unsuccessful, he stepped back and picked up a fence-rail lying near, which was about ten feet long and the thickness of a

man's arm, and when the deceased had nearly finished cutting off a piece of the meat, probably about two pounds and a half, struck at him, sidewise, hitting him on the head and knocking him away from the meat. He then threw down the rail, picked up the meat and put it back in the wagon, and went on his way. The blow cut the skin and made a wound about two inches long on the head of the deceased, but it did not appear that the skull was broken. From this wound he died the next day.

1, 3. The theory of the defence was that the killing was justifiable, because done to prevent a robbery; and that if the deceased was not attempting a robbery, his trespass upon the defendant was such that the homicide, if not justifiable, was not murder but merely manslaughter. In defence of his property " against one who manifestly intends, by violence or surprise, to commit a felony" thereon, a person may kill the aggressor, if he does so under a reasonable belief that the killing is necessary for that purpose. (Code, §4330; 1 East P. C. 271; 1 Bish. Crim. L., 8 ed. 853, 875.) To constitute robbery, there must be force or intimidation, asportation without the consent of the owner, and an intent to steal. It is unnecessary that the taking shall be directly from the person of the owner; it is sufficient if it is done in his presence, against his will, by violence or putting him in fear. (*Clements v. State*, 84 *Ga.* 660, same case, 20 Am. St. Rep. 385; 2 Bish. Crim. L., 8 ed. §1178.) It was contended on the part of the State that in this case the trespass could not have amounted to a robbery, because the taking was under a claim of right, with the purpose of applying the property taken to the payment of a debt from the defendant to the deceased. It is true such a taking, although wrongful and violent, would not be robbery if the claim of right was in good faith, and if the taking was for no other purpose than

to satisfy the claim; in such case the *animus furandi* would be lacking. But it would be otherwise if the claim of right was a mere pretext covering an intent to steal. (2 Bish. Crim. L., 8 ed. §1162a, and cases cited; 2 Russ. Crimes, *111–114; *Long* v. *State*, 12 *Ga.* 293 *et seq.*) Although in this case the indications of such an intent are slight, there were circumstances, such as the refusal of the deceased to wait until they arrived at the defendant's house and his refusal to take the amount offered him in payment of his claim, and perhaps the quantity of meat the deceased was taking, which might have led the defendant to suppose that the taking was not so much to secure payment of the amount claimed, as it was to deprive him of his property or of an undue quantity of it, and thereby obtain a fraudulent advantage. The trial judge ought, therefore, to have submitted to the jury the question whether, under the circumstances in evidence, the defendant had reason to believe that the claim of right was made and acted upon in good faith, or was merely a pretext resorted to as cover for a fraudulent intent.

In charging upon the right to kill in defending against a robbery, the court instructed the jury that this right would not exist after the possession of the property had passed from the owner to the person taking. This instruction, under the evidence in this case, was improper; because no such change of possession as had taken place would cut off the right of the defendant to protect his property against a felonious taking, the property being still in his immediate presence, and the deceased being then engaged in severing that part of the meat which he had said it was his intention to take, and in resisting with his knife the efforts of the defendant to prevent him from carrying out this intention. The taking was not a past, but a present and progressing injury; and if the defendant acted under a reasonable

v 90–45

belief that the purpose of the taking was robbery, he had the right to arrest it in the manner he did, although there may have been already such a change of possession as would in law amount to a robbery. The right of the owner of property to defend it against a felonious taking, to the extent if necessary of killing the person taking, does not end at the moment the guilt of that person is technically complete. It extends not merely to the prevention of such asportation as may be sufficient to render the person taking guilty of robbery, and which may be effected by the slightest change of possession, but to the prevention of his carrying off the property which he has thus gotten from the owner. The object of the law being to allow the owner to protect his property against the robber, it would be unreasonable to hold that at the moment such asportation is accomplished, and before the robber has gotten away with the article taken, the right of the owner to defend his property is at an end; and that where the moment before he could lawfully kill in defence of it, he must yield after the slightest change of possession has been effected, and if he then killed the robber to prevent the article from being carried off, would be guilty of murder. The effect of the instruction, as to change of possession, was to exclude the defence that the killing was done to prevent a robbery; and although, as we have said, the evidence to sustain this theory is slight, the jury were authorized to adopt it, and might have seen proper to do so, had it not been for the charge referred to.

If, however, the evidence does not sustain this theory, we think it tends rather to make out a case of manslaughter than of murder; though we do not go to the length of upholding the position taken by counsel for the accused, that a homicide to prevent a mere trespass not amounting to a felony, is manslaughter only. That view finds no sanction in any adjudication of this court,

nor in the authorities generally; at least, where, as in this case, the trespass is upon property of trifling value, not at the habitation. In *Hayes* v. *The State*, 58 *Ga.* 46, it is said that " to intentionally kill, with a deadly weapon, one who is committing a trespass upon property, is generally murder, and not manslaughter," and that no exception to this general rule is involved where the trespass is " the appropriation and removal of a small piece of timber of trifling value." And it is explained that what is said in *Monroe's* case, 5 *Ga.* 86, relied upon by counsel here, and in the *Keener* case, 18 *Ga.* 194, to the effect that a trespass amounting to a misdemeanor will reduce the killing to manslaughter, "refers to trespass affecting the person and not to trespass affecting the goods only." See also: Wharton, Homicide, §414; Kerr, Homicide, §§12, 13, 149, 185; 9 Am. & Eng. Enc. of·L. 586. But while· a trespass of this kind does not justify a killing, and is not of itself sufficient to reduce the homicide to manslaughter, yet if the circumstances should show that the killing was the result of a sudden, violent impulse of passion, provoked by the trespass, and acted upon before the passion had time to cool, we think the trespass would amount to such a reasonable provocation as in law would justify the excitement of passion, and thus operate to reduce the offence to manslaughter; certainly this would be so if, as in this case, the trespass was accompanied with · assaults against the person of the owner with a knife, in resistance to his efforts to prevent the trespasser from carrying away his property. Some of the authorities, it is true, " appear to lay down the doctrine, that, though the passions become excited in the mere defence of property, other than the dwelling-house, a killing with a deadly weapon used in such defence, or other like dangerous means, is murder," but this doctrine, says Mr. Bishop (2 Crim. Law, 7 ed. §706, n.), "though

stated many times in the books, is not sufficiently founded in actual adjudication to be received without further examination. For surely, although a màn is not so quickly excited by an attack on his property as on his person, and therefore the two cases are not precisely on the same foundation, yet, since he has the right to defend his property by all means short of such as produce death, if, in the heat of passion arising during a lawful defence, he seizes a deadly weapon, and with it unfortunately takes the aggressor's life, every principle which in other cases dictates the reduction of the crime to the mitigated form requires the same in this case."] See also 9 Am. & Eng. Enc. L. 586–7 ; 1 Whart. Crim. L., 9 ed. §462. The kinds of provocation which our code, in defining what shall constitute voluntary manslaughter, declares insufficient to reduce the homicide to that grade, are " words, threats, menaces or contemptuous gestures" (§4325) ; but it does not exclude from among the reasonable grounds of provocation a trespass upon property, accompanied with such hostile demonstrations against the person of the owner as were shown to have taken place in this case. The test laid down by this section, by which to determine whether the offence shall be reduced to manslaughter, is, that " the killing must be the result of that sudden, violent impulse of passion supposed to be irresistible," and that "there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied."

In the present case we think the circumstances conform to this test. We think they may properly be classed among those circumstances which justify the excitement of passion and exclude the idea of delibera-

tion or malice. The deceased, as we have seen, was the
aggressor, having provoked the first quarrel, and having
afterwards followed up the defendant when .the latter
was seeking to get away from him, and renewed the·
difficulty by taking the defendant's meat and proceed-
ing, despite his remonstrances, to cut it up, with the
avowed intention of carrying off a part of it; at the
same time adding to the provocation by making repeated
assaults against the defendant with a knife while he was
seeking to get back his property; and this notwith-
standing the money claimed .to be due from the de-
fendant had then and there been offered to the deceased.
The use of a weapon by the defendant was evidently an
afterthought, and was resorted to only after his repeated
efforts to get back his property without such means had
proved unavailing, and after he had been wrought up
by continued provocation. In this emergency and act-
ing in the heat of the moment, he picked up the rail, a
chance weapon, probably the first thing he saw lying at
hand, and struck at the aggressor with it, hitting side-
wise, and apparently, as a witness testified, for the pur-
pose of knocking him away from the meat, rather than
of taking his life. He struck but one blow, and made
no further demonstration against the deceased, but at
once threw down the rail, picked up his meat and went
on his way. There is no indication of deliberation or
premeditation on the part of the defendant; there is no
showing of express malice, and the circumstances tend
strongly to rebut the implication of malice which arises
from the dangerous character of the weapon. See *Ray
v. State*, 15 *Ga.* 223, 244, where it is said: " The fact
that a prisoner had accidentally and hastily taken up a
board, with which, in a conflict, he inflicted blows that
produced death, and had not provided the same or any
other deadly instrument beforehand, is a circumstance
which does not favor the conclusion that malice should

be implied because a weapon was used likely to produce death." It is likely that if the law of manslaughter had been explained to the jury in such a manner as to enable them to understand its application to the state of facts before them, they would not have found the defendant guilty of murder. The court, it is true, gave in charge the sections of the code defining manslaughter, but did not add such explanations as would have been proper to aid the jury in applying the law, as therein stated, to the circumstances of this case. Upon the whole, we are satisfied, after a careful review of the record, that the ends of justice will be subserved by awarding a new trial.

4. It is complained that the court erred in charging that section 4332 of the code, which declares that " if after persuasion, remonstrance or other gentle means used, a forcible attack and invasion on the property or habitation of another cannot be prevented, it shall be justifiable homicide to kill the person so forcibly attacking and invading," etc., does not apply to the defence of property which is not at the habitation. It is questionable whether this construction is correct, although it is in accord with the view expressed by LOCH-RANE, C. J., in the *Pound* case, 43 *Ga.* 89. What was there said on this subject, however, was unnecessary to the adjudication in that case, and is to be taken as *dictum* merely. But whether this construction is correct or not, the section quoted does not apply to every attack or invasion on property. The concluding part of the section says, it must appear " that a *serious* injury was intended, or might accrue, to the person, property or family of the person killing." It has no application where the property attacked or invaded is so inconsiderable that the injury intended is not serious but slight, such as severing from a side of meat a small part of it,— certainly not where the injury is not proceeding to a

felony. It would be out of harmony with the general spirit of the law of homicide, which should govern in the construction of this section of the code, to treat the section as authorizing the taking of human life for a trivial injury to property, not involving a felony. It could not have been the intention of the codifiers or of the legislature in adopting the penal code, to make such a radical departure from the established law on this subject as it stood before the adoption of the code; and the section has never been so understood by this court. If the deceased in this case intended a felony, and if this section was applicable, the defendant lost nothing from the fact that the court treated it as inapplicable, the law as to the defence of property against a felony being given in charge, as laid down in section 4330 of the code.

*Judgment reversed.*