776 A.2d 669

**Roosevelt Preston SYDNOR**

v.

**STATE of Maryland.**

**No. 83 Sept. Term, 2000.**

Court of Appeals of Maryland.

July 20, 2001.

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief) Baltimore, for petitioner.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Attorney General of Maryland, on brief) Baltimore, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), JJ.

WILNER, J.

On the evening of December 9, 1998, petitioner was sitting with some friends on the front steps of 907 North Chester Street, in Baltimore, when one Anthony Jackson approached and asked if petitioner had any "weed" to sell. When petitioner responded in the negative, Jackson, apparently eyeing a gold chain petitioner was wearing, pulled a gun and told him to "give it up." After hitting petitioner on the head with the gun and threatening to kill him, Jackson took $30 in cash from petitioner and was about to take the gold chain as well when petitioner, assisted by his friends, grabbed the gun and, after a struggle, was able to take it from Jackson. As Jackson then attempted to flee, petitioner fired five shots at him, hitting him four times—once in the front of his thigh, once in the forearm, and twice in his back. One of the back wounds was surrounded by stippling, indicating that the gun was fired from close range. Jackson collapsed and died in the street in front of 922 North Chester Street—40 to 50 yards from where the robbery occurred.[1] Immediately after shooting Jackson, petitioner, along with his friends, ran away.

---

1. The dissent speculates that the distance between the tussle for the gun and the killing of Jackson may have been only 20–25 feet. In a large

Those basic facts were largely undisputed. What *was* in dispute was how, where, and why the shooting occurred. Those disputes were presented and resolved in the Circuit Court for Baltimore City, where a jury convicted petitioner of voluntary manslaughter and use of a handgun in the commission of a felony but acquitted him of first and second degree murder and carrying a handgun.

The State's theory was that, after wresting the gun away from Jackson, an enraged petitioner, intent only on revenge, chased and shot Jackson as he attempted to flee. That theory was supported by evidence that five bullet casings were found in the street near where Jackson collapsed, photographs depicting the four wounds suffered by him, and the testimony of Yvette Kiah, Yavonda Jones, and several police officers. Ms. Kiah, who lived at 922 North Chester Street, observed the struggle, heard one of the men say something like, "Well, if you have a gun you better use it," and, after turning away, heard people running followed by five or six gunshots. Ms. Jones said that, as she was leaving her house in the 800 block of North Chester Street, she observed the struggle and then saw petitioner take a gun away from Jackson. She said that Jackson "tried to run and he [petitioner] shot him in his back and then he ran in the opposite direction." Several police officers were in the vicinity at the time and, hearing the shots, responded to the scene. They saw petitioner, who was identified by witnesses as the shooter, running away, whereupon they gave chase and eventually apprehended him, still in possession of the gun.

Although petitioner did not testify at trial, statements he made to the police following his arrest were admitted into evidence. Immediately upon his apprehension, he stated to

---

sense, the distance has no independent relevance—the issue being whether the use of deadly force was necessary in the circumstances—but the record clearly supports the testimony that Jackson had run (and been chased) for 40–50 yards. A drawing of the 900 block of North Chester Street, to scale, confirms that distance, as does evidence that the five bullet casings were found near the body, not closer to the scene of the robbery.

Office Quintner, who was guarding him, "I shot [Jackson] because he was beating me with a gun and robbed me for $30 so I took the gun from him and shot him." At the police station, petitioner gave a formal, taped statement, in which he said that the struggle for the gun landed them both on the ground near the steps and that, after obtaining the gun, he "panicked" and "just shot at him, as soon as I got the gun from him." Petitioner added that he did not know whether Jackson had another gun, but that "I was already aggravated over the fact that he said he was going to kill me." In a later part of his statement, he said that Jackson acted like he was getting ready to "go back in his jacket," and "[s]o I panicked even more and just got to shooting." The shooting occurred, petitioner said, when Jackson was in the middle of the street, with petitioner about five feet from him.

The issue now before us arose in the context of the court's jury instructions. After instructing on the law of murder and manslaughter, the court explained the defense of self-defense raised by petitioner. In doing so, it told the jury, in pertinent part and without objection:

"In addition, before using deadly force, the defendant is required to make all reasonable efforts to retreat. Defendant does not have to retreat if the defendant was in his home or retreat was unsafe or the avenue of retreat was unknown to the defendant *or the defendant was being robbed at the moment that the force was used* or the defendant was lawfully arresting the victim."

(Emphasis added).

That portion of the instruction was taken nearly verbatim from the language recommended in § 5:07 of the Maryland Criminal Pattern Jury Instructions. During deliberations, the jury asked for and received additional instructions on murder and voluntary manslaughter. In the course of those additional instructions, the court modified slightly what it previously said regarding self defense:

"In addition, before using deadly force, the defendant is required to make all reasonable effort to retreat. The

defendant does not have to retreat if the defendant was in his home or retreat was unsafe or if the avenue of retreat was unknown to the defendant or *if at the moment that the shots were fired the defendant was being robbed,* or the defendant was lawfully arresting the victim."

(Emphasis added).

Noting the difference in language, defense counsel objected, stating that the change from "the defendant was being robbed at the moment that the force was used" to "at the moment that the shots were fired the defendant was being robbed" constituted "commentary." No further explanation for the objection was given. The court responded that it "did the same thing in the original," the reason being that "it could be confusing for the jury to view the robbery and the shooting as one incident when, in fact, it was also possible for them to view it as separate incidents."

At the appellate level, petitioner has greatly expanded his cryptic complaint that the supplemental instruction constituted "commentary." Relying principally on Eighteenth Century English commentary, some Nineteenth Century cases, and cases involving the felony-murder rule, he urges that he had a right to stand his ground and use deadly force to resist the robbery without having to retreat and that that right continued during the period that Jackson was in flight. A robbery, he argues, continues until such time as the robber has made good his or her escape and reached a place of temporary safety, and the victim may continue to use deadly force to resist and recover the property taken until the robber has, in fact, made good the escape. In making this argument, he has never claimed that he was in or even near his home when the robbery occurred or that the shooting was part of any effort to arrest Jackson.

The Court of Special Appeals, finding that the argument had been preserved for appellate review, rejected it, holding that "[w]hen a defendant seeks to escape criminal responsibility by claiming deadly force was employed to repel force, threat of force or intimidation employed by a robber, however,

proof that the force exerted by the accused was employed at a time other than when he was being robbed is the *sine qua non* of proof of excessive force." *Sydnor v. State,* 133 Md.App. 173, 185, 754 A.2d 1064, 1070 (2000). That court continued that the use of deadly force "must be confined to repulsion of the robber at the moment that the robber exerts force or exhibits a threat of force" but that, "[o]nce the imminent threat of death or serious bodily harm dissipates, a lethal response is no longer warranted." *Id.* at 187, 754 A.2d at 1072. Notwithstanding petitioner's views to the contrary, we agree with that analysis and shall affirm.

## *DISCUSSION*

The right to act in self-defense has been regarded as a natural right, taken all but for granted, but, as a legal defense to a charge of homicide, it was not part of early English common law. Although much of its development is of historical interest only, the theoretical underpinnings of that development still have some influence. As noted by Joseph Beale, from the beginning of the jurisdiction of the king's courts over crime to the reign of Edward I in the Thirteenth Century, homicide could be justified only when committed in execution of the king's writ or, by custom, when apprehending an outlaw who resisted. Joseph H. Beale, Jr., *Retreat from a Murderous Assault,* 16 HARV. L.REV. 567, 567–68 (1903).

The privilege to use deadly force in self-defense developed from two strains of English law. Blackstone, citing both Hawkins and Hale, observed that there were three kinds of homicide—justifiable, excusable, and felonious. WILLIAM BLACKSTONE, 4 COMMENTARIES ON THE LAWS OF ENGLAND 177 (1769). Justifiable homicide was one "owing to some unavoidable *necessity,* without any will, intention, or desire, and without any inadvertence or negligence, in the party killing, and therefore without any shadow of blame." *Id.* at 178. It was a homicide committed by the absolute command of the law, either for the advancement of public justice (as where a public officer kills in the execution of his or her office) or for the prevention of some atrocious crime which could not other-

wise be avoided. *Id.* at 179–80. As to the latter, Blackstone noted, as an example, that "[i]f any person attempts a robbery or murder of another, or attempts to break open a house *in the night time,* (which extends also to an attempt to burn it,) and shall be killed in such attempt, the slayer shall be acquitted and discharged." *Id.* at 180. "This reaches," he continued, "not to any crime unaccompanied with force, as picking of pockets; or to the breaking open of any house *in the day time,* unless it carries with it an attempt of robbery also." *Id.* In the case of a justifiable homicide, Blackstone stated, the slayer was entirely without fault and was entitled to acquittal. No duty to retreat, in an effort to avoid the need to use deadly force, attended a justifiable homicide.

An excusable homicide, according to Blackstone, could be of two types—*per infortunium,* or misadventure, and *se defendendo,* or self-defense. The first was where one doing a lawful act, without any intention to harm, unfortunately killed another, as where the head of a hatchet being lawfully used by a person flew off and killed a bystander. The second type, he made clear, was distinguishable from the justifiable variety of homicide "calculated to hinder the perpetration of a capital crime" and concerned the case of a person protecting himself or herself "from an assault, or the like, in the course of a sudden brawl or quarrel, by killing him who assaults him." *Id.* at 183–84. In that situation, which the writers of the time called *chance-medley,* the right of natural defense did not include attacking the assailant, and, to excuse homicide by a plea of self-defense, "it must appear that the slayer had no other possible means of escaping from his assailant." *Id.* at 184. Thus, "the law requires, that the person, who kills another in his own defence, should have retreated as far as he conveniently or safely can, to avoid the violence of the assault, before he turns upon his assailant...." *Id.* at 184–85.

In earlier days, an excusable homicide did not justify an acquittal, because *some,* even if not complete, blame attached to the slayer. Upon conviction, the defendant would escape bodily punishment and was entitled to bail, but his goods were forfeit unless and until he was pardoned by the king. In time,

the pardons became issued routinely by the chancellor, and, eventually, the defendant was simply acquitted, in the same manner as the perpetrator of a justifiable homicide. *See* EDWARD H. EAST, 1 PLEAS OF THE CROWN at 220 (1806). Foster attributes the change to the statute of 24 Henry 8, c. 5. MICHAEL FOSTER, CROWN CASES at 275 (3d ed. 1809). To that practical extent, the two forms of defense—justifiable and excusable homicide—merged; they did not merge, however, with respect to the duty to retreat in an effort to avoid the need for deadly force. That issue, initially germane only with respect to what formerly was an excusable homicide, remained a focal point of debate and, to some extent, remains so today.

The views expressed by Blackstone are consistent with those stated by East, Hawkins, Hale, and Foster. *See* EAST, *supra*, 219–22; WILLIAM HAWKINS, 1 PLEAS OF THE CROWN 79–88 (John Curwood ed., 8th ed. 1824); MATTHEW HALE, 1 HISTORY OF THE PLEAS OF THE CROWN 478–92 (1847); FOSTER, *supra*, 273–78. Thus, Foster wrote:

"In the case of justifiable self-defence the injured party may repel force by force in defence of his person, habitation, or property, against one who manifestly intendeth and endeavoureth by violence or surprize to commit a known felony upon either. In these cases he is not obliged to retreat, but may pursue his adversary *till he findeth himself out of danger,* and if in a conflict between them he happeneth to kill, such killing is justifiable."

FOSTER, *supra*, at 273 (emphasis added). On the other hand:
"He therefore who, in the case of mutual conflict, would excuse himself upon the foot of self-defence must shew, that before a mortal stroke given he had declined any farther combat and retreated as far as he could with safety; and also that he killed his adversary through mere necessity, and to avoid immediate death. If he faileth in either of these circumstances he will incur the penalties of manslaughter."

*Id.* at 277.

As Wharton noted, when these two rules were construed with relation to each other, the duty of an assaulted person to

retreat seemed to depend on whether killing the assailant under the circumstances would be justifiable or merely excusable. If the former, there was no duty to retreat; if the latter, there was. FRANCIS WHARTON, THE LAW OF HOMICIDE, § 291 (Frank H. Bowlby ed., 3d ed.1907). Beale took issue with that approach. Though acknowledging that the line between the authority to stand one's ground and the duty to retreat to avoid the necessity of killing was consistent with the distinction in the old law between justifiable and excusable homicides—between homicides committed in execution of the law and those committed in private defense—Beale asserted that Foster failed, in the case of an excusable homicide, to distinguish between the function of retreat as a means of avoiding the need to kill, and its function to avoid responsibility for the combat, and that, in effect, he blurred the distinctions between justifiable and excusable homicides. Beale, *supra*, at 575–76.

Noting a split of authority in the United States on whether, generally, a person under attack by another may stand his ground and resist with deadly force or must retreat if retreat is possible, Beale took as the prevailing rule that "there is no need of retreat, but the assailed may kill the assailant if it is otherwise necessary to save his own life," that "if retreat would not (so far as the assailant can see) diminish the danger, he may defend himself on the spot," and that "if one is assailed in his own dwelling-house, which is his castle, he is not obliged to withdraw therefrom and leave himself in that respect defenseless." *Id.* at 579. He urged, however, that no killing that is not necessary can be justified, that it is not necessary to kill in self-defense when the person under attack can defend himself/herself by withdrawing, and that "[t]he only property which the law permits him to protect by killing a wrongdoer is his dwelling-house, and that only when its protection is necessary to the safety of his person." *Id.* at 580–81.

Perkins and Boyce, writing in 1982, favored Foster's view, rather than that of Beale. They regarded the majority American view to be that a blameless person who is the subject of a

"murderous assault" may stand his or her ground and use deadly force if reasonably necessary to save himself/herself. They acknowledged, however, that a substantial minority of jurisdictions had adopted the view that even an innocent victim of a murderous assault must elect an obviously safe retreat, if available, rather than resort to deadly force, unless (1) the victim is in his/her home at the time, (2) the assailant is one he/she is lawfully attempting to arrest, or (3) the assailant is a robber. *See* ROLLIN PERKINS AND RONALD BOYCE, CRIMINAL LAW 1119–37 (3d ed.1982). *See also Self–Help: Extrajudicial Rights, Privileges and Remedies in Contemporary American Society,* 37 Vand. L.Rev. 845, 882–83 (1984) (noting the split of authority on whether deadly force may be used without safe retreat but asserting that "[b]ecause a successful retreat prevents harm to both aggressors and defenders, a duty to retreat before the use of deadly force seems to be a desirable limitation on the privilege of self-defense").

The initial distinctions, trumpeted in some of the early commentary and applied in some 19th Century cases, have, indeed, become blurred, and the law now, governed in many States by statute, seems inclined to limit one's ability to use deadly force to the situation where such force is reasonably necessary to protect oneself from imminent threat of death or serious injury.[2] The duty to retreat, other than from one's own home, if retreat is safely possible, is a consideration, though a critical one, in determining the necessity for using deadly force, as is the prospect of standing one's ground and resisting with non-deadly force.

In *Bruce v. State,* 218 Md. 87, 96–97, 145 A.2d 428, 433 (1958), we approved the following jury instruction on self-defense:

---

**2.** Approximately 35 States have statutes that define the circumstances when deadly force is permissible. Only one, in Texas, comes close to allowing the victim of a robbery to use deadly force against the fleeing robber for the purpose of recovering the stolen property, absent a continuing imminent danger from the robber of death or serious bodily harm. *See* TEX. PENAL CODE ANN. § 9.42.

"[I]n order to justify or excuse the killing of another on the ground of self-defense, it was necessary to establish that the defendant was not the aggressor and did not provoke the conflict; that the defendant believed *at the time* he was in such immediate danger of losing his own life or suffering serious bodily harm as made it necessary to take the life of the deceased to save himself; that the circumstances were such as to warrant reasonable grounds for such belief in the mind of a [person] of ordinary reason; that, *if the peril of the defendant was imminent,* he did not have to retreat but had the right to stand his ground and to defend and protect himself; that an attempted battery may be met by resisting force with force *provided no unnecessary violence was used and proper measures were taken to avoid the conflict and escape from shedding blood; and that it was the duty of the defendant to retreat or avoid danger if such means were within his power and consistent with his safety.*"

(Emphasis added).

■ Those rules, in somewhat briefer form, continue to apply. There remain as essential elements of the defense the "duty of the defendant to retreat or avoid danger if such means were within his power and consistent with his safety," *Burch v. State,* 346 Md. 253, 283, 696 A.2d 443, 458 (quoting *Bruce,* 218 Md. at 97, 145 A.2d at 433), *cert. denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997), and that the accused have "used no more force than the exigency required." *State v. Martin,* 329 Md. 351, 357, 619 A.2d 992, 995 (citing *State v. Faulkner,* 301 Md. 482, 486, 483 A.2d 759, 764 (1984)), *cert. denied,* 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993). *See also Dykes v. State,* 319 Md. 206, 211, 571 A.2d 1251, 1254 (1990) and *State v. Marr,* 362 Md. 467, 473, 765 A.2d 645, 648 (2001).

■ The emphasized language from *Bruce,* read in harmony, makes clear that the defense of self-defense has substance only when the deadly force used was necessary at the moment of imminent danger. We have never adopted the view, and are unwilling to do so now, that, other than when

acting pursuant to an absolute command of the law, a person may use deadly force against another when the use of that deadly force, at the moment and in the circumstance used, was not necessary to protect against an imminent threat of death or serious bodily injury.[3] Under this view, which is the established Maryland law, the right to use deadly force to resist a robbery, or other attempted or ongoing assault or felony, exists only during the time that the victim of the attack reasonably believes that such force is necessary to repel an imminent danger of death or serious bodily harm—during the time that "the exigency demanded" the use of such force.

Petitioner seeks to avoid that principle by focusing on the substantive crime of robbery and its impact on the felony-murder rule. Citing *Ball v. State,* 347 Md. 156, 699 A.2d 1170 (1997), *cert. denied,* 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998), he urges that we have defined the crime of robbery as "a continuous transaction that is not complete until the perpetrator reaches a place of temporary safety." Coupling with that the attendant rule that a murder committed while a robber is fleeing or attempting his/her escape is regarded as a murder "in the perpetration" of the robbery for purposes of the felony-murder rule, he contends that, since a person may use deadly force to resist a robbery and since the robbery does not end until the robber has made good his or her escape, the victim of the robbery may use deadly force to resist, or even to recover his or her stolen property, at least until the robber reaches that place of temporary safety. There are several fallacies in that argument, the principal one being its irrelevance to the issue at hand.

It is certainly true that, for some purposes, a robbery (and other crimes as well) is treated as continuing beyond completion of the core event—the forcible taking and asportation of property in the case of robbery, the setting of a fire in the

---

**3.** We are obviously not dealing here with the situation in which deadly force was used pursuant to command of the law, as with the execution of a sentence of death duly imposed by a court, or, indeed, with the military law that governs the conduct of military personnel in battle.

case of arson, the sexual attack in the case of rape or other sexual offenses—to include the felon's escape to a point of safety. *Ball,* among many other cases, illustrates how and when that principle operates. *Ball* was a death penalty case in which the defendant, in the course of burglarizing a home, seized jewelry and other items from a bedroom and then, upon being surprised by the return of a resident, shot and killed her. He argued that he had not committed a robbery, which the State used as an aggravating factor in support of the death penalty, because no force had been employed in the taking of the property and that, for there to be a robbery, the force must precede or coincide with the taking. Rejecting that defense, we opted instead to define the crime of robbery in conformance with the "continuous offense" theory and held that "[t]he mere fact that some asportation has occurred before the use of force does not mean that the perpetrator is thereafter not guilty of the offense of robbery" and that if "the use of force enables the accused to retain possession of the property in the face of immediate resistance from the victim, then the taking is properly considered a robbery." *Id.* at 188, 699 A.2d at 1185. *See also Jackson v. State,* 286 Md. 430, 408 A.2d 711 (1979) (applying felony-murder rule to murder committed while robber attempting to flee); *Watkins v. State,* 357 Md. 258, 744 A.2d 1 (2000) (applying felony-murder rule to the killing of a witness after forcible taking of the property was completed); Annotation, *What Constitutes Termination of Felony for Purpose of Felony–Murder Rule,* 58 A.L.R.3d 851 (1974 and Supp.).

That principle does not, however, expand or trump the rule that limits the right to use deadly force to the time and circumstance that such force is necessary. The issue in a self-defense situation, under current Maryland law, is not whether the criminal enterprise is still in operation, but whether deadly force is then and there necessary to avoid imminent danger of death or serious bodily harm to the victim of the offense. If it is not, deadly force may not be used because its use (1) would be excessive and not required by the exigency of the moment, and therefore (2) would not then be for true self-defense, but

for some other purpose—to prevent the felon's escape, perhaps, or to recover the stolen property. Essentially, the force used is then in defense of property, not in defense of oneself. Although some of the older commentary cited above and relied upon by petitioner regarded a killing in resistance to a robbery or other capital felony as being justifiable, even that commentary distinguished between force being used to repel force and force being used merely in defense of property, the latter not being justifiable. *See* 4 BLACKSTONE, *supra*, at 180.

As we indicated, the early distinctions between justifiable and excusable homicide, from which the law of self-defense emerged, soon became entwined and blurred. The notion, as part of the law of justifiable homicide, that it was permissible to resist robbery and other violent capital offenses with deadly force was based on the presumed imminent threat to life or limb posed by such felonies, not on the fact that they may entail the loss of property. *See People v. Ceballos*, 12 Cal.3d 470, 116 Cal.Rptr. 233, 526 P.2d 241, 249 (1974) ("at common law in general deadly force could not be used solely for the protection of property"); *State v. Harris*, 222 N.W.2d 462, 466–67 (Iowa 1974). The point was always the necessity for the use of such force to protect oneself. That is the only premise that reasonably can justify the use of deadly force, for to hold otherwise would be to allow the use of spring guns and other such devices to deter the trespass to and stealing of property and, as stated in *United States v. Gilliam*, 25 F. Cases 1319, 1320, No. 15,205a (1882), thereby "arrogate[ ] for property higher immunities and privileges than are conceded to our dearest personal rights." To bring the use of deadly force within the ambit of permissible self-defense, even in resistance of a robbery, burglary, or other assault or felony, there must be a reasonable fear of death or serious bodily injury at the moment the deadly force is used. *See Hull v. State*, 74 Tenn. 249, 1880 WL 4728, 1880 Tenn. LEXIS 243 (1880). The challenged instruction was to that effect, and it was entirely proper. If, upon wresting the gun away from Jackson, petitioner was no longer in any imminent danger of death or serious bodily harm, he had no right, after chasing

Jackson down the street, to shoot him to death. Whether or not the robbery was still technically or legally in progress, that was not self-defense. Nor is it justifiable under any other theory that we are prepared to accept.[4]

JUDGMENT AFFIRMED, WITH COSTS.

RAKER, J., concurring in result only:

I concur in the judgment of the Court only. I would affirm petitioner's convictions for voluntary manslaughter and use of a handgun in the commission of a felony, but only because I believe, based on the facts of the case before us, that the question presented in the Petition for Certiorari and argued between the majority and dissenting opinions is not properly presented for review by this Court.

Petitioner argues, and the dissent agrees, that the trial court erred in instructing the jury on the applicable law regarding the killing of the perpetrator of a violent felony by the victim of the felony. The thrust of petitioner's argument is that the victim of an armed robbery has no duty to retreat, but instead can employ deadly force to regain stolen property, even after the threat of deadly force to the victim has dissipated, as long as the robbery itself is still ongoing.[1]

The State argues, and the Court of Special Appeals and the majority find, that the right to employ deadly force to resist a

---

**4.** The dissent views this Opinion as requiring victims of violent crimes "to submit to being robbed and beaten at gunpoint, without the right to respond with all necessary force during the act." That is not the case. The victim of any violent crime does have the right to respond "with all *necessary* force during the act." The question is what force was necessary. Using deadly force to recover property is *not* necessary, and, indeed, with ordinary civilians blazing away while running down the street, it is more likely to result in the death or injury to innocent bystanders, than it is to slay or capture the robber. Under long-standing Maryland law, deadly force may be used when the exigency demands it, to resist the imminent danger of death or serious bodily harm. Short of that, only non-deadly force may be used.

**1.** As the opinion of the Court notes, *see* maj. op. at 210, Sydnor does not argue that the shooting resulted from an effort to apprehend Jackson for prosecution.

robbery exists only at the moment when such force is necessary to protect against an imminent threat of death or serious bodily injury. *See* maj. op. at 216–217. Therefore, the majority concludes, the question is not whether the robbery is still ongoing, but whether deadly force is necessary to prevent death or serious bodily harm to the victim of the robbery. *See id.* at 218–219.

The question, as presented by this appeal, is entirely academic because the argument (of whether the right to employ deadly force to repel an armed robbery continues throughout the course of the robbery or only while the threat of death or serious bodily harm remains) is not properly presented by the trial court's supplemental self-defense jury instruction to which petitioner objected in this case.

The trial court's original jury instruction, to which petitioner did not object, was that petitioner did not have the duty to retreat if he "was being robbed *at the moment that the force was used* " (emphasis added). After the jury requested additional instructions on murder and voluntary manslaughter, the court gave a supplemental instruction, informing the jury that petitioner did not have the duty to retreat "if *at the moment that the shots were fired* [he] was being robbed" (emphasis added). Petitioner objected to the supplemental instruction on the basis of the change in language from "at the moment that the force was used" to "at the moment that the shots were fired."

I simply fail to discern any legal significance to the difference in language in the two instructions. Both are accurate statements of the law of self-defense, and both instructions informed the jury that petitioner did not have the duty to retreat if he was being robbed at the time that he employed deadly force.

More importantly, it is not at all clear how the change from force-being-used, on the one hand, to shots-being-fired, on the other hand, adequately presents the question being argued on this appeal of whether the right to use deadly force to repel an armed robbery continues as long as the robbery is ongoing. Both the original and the supplemental jury instruction re-

quired the same temporal relationship between the robbery and the use of deadly force.[2]

At trial, petitioner's counsel objected to the supplemental instruction solely on the ground that its difference in language constituted "commentary," without any distinct explanation of how it was inadequate or specific suggestion of how the instruction should be amended. *Cf. Bowman v. State,* 337 Md. 65, 68–69, 650 A.2d 954, 956 (1994) (finding, *inter alia,* objection to jury instruction on imperfect self-defense waived by failure to offer specific additional instructions at the time of the objection). Petitioner's duty-to-retreat argument was not presented to the trial court, but was advanced for the first time on appeal. *See* Maryland Rule 4–325(e) (requiring a party to object promptly to jury instructions and state the grounds of the objection distinctly). In keeping with the well-known tenet that appellate courts should not decide issues unnecessarily, *see Philip Morris, Inc. v. Angeletti,* 358 Md. 689, 722, 752 A.2d 200, 218 (2000), particularly when such issues were not raised in or decided by the trial court, *see* Maryland Rule 8–131(a), I would not reach the ground of decision relied upon by the Court of Special Appeals on the facts presented in this appeal. I would reserve resolution of this complex issue for a time when it is more precisely framed for decision by this Court. *See, e.g., Blanchfield v. Dennis,* 292 Md. 319, 322 n. 3, 438 A.2d 1330, 1332 n. 3 (1982). Therefore, I join the majority only in the judgment to affirm petitioner's convictions.

Judge RODOWSKY has authorized me to state that he joins in the views expressed herein.

---

**2.** Such a question might have been ripe for appellate review if petitioner had requested a jury instruction clarifying what was meant by "being robbed" and was denied, but that was not the objection that was made and preserved for review. The particular jury instruction at issue does not require us to resolve the propriety of the part of the self-defense instruction regarding the scope of the robbery. In fact, if anything, the jury instruction given by the trial court in this case was *more favorable* to petitioner than the majority opinion since it seems to imply that he could have used deadly force as long as he was "being robbed."

CATHELL, J., dissenting.

I respectfully dissent. It is my view that the robbery was still in progress when Mr. Jackson was shot. If that is so, under Maryland law, as it existed at the time of the shooting, Mr. Sydnor had the right to shoot Mr. Jackson. It helps, I think, to revisit the facts.

Mr. Sydnor was peaceably sitting on the steps of a house in Baltimore City. He was unarmed, and so far as the record reflects, minding his own business. Mr. Jackson came down the street looking for someone to rob. He saw the defendant sitting on the steps and made the fatal mistake of thinking that Mr. Sydnor, sitting so peaceably, would give up his money upon being threatened by Mr. Jackson's handgun. Such was not the case.

Mr. Jackson brandished a handgun at the defendant and demanded his money. It appears that this threatening display was not sufficient to cause Mr. Sydnor to give up his money. Mr. Jackson then made another mistake; he began to beat the defendant over the head with the gun, while forcibly removing $30.00 from the pockets of Mr. Sydnor. In addition to being an unkind act, this was another mistake, as it raised the ire of the defendant and he began to scuffle with Mr. Jackson. The altercation moved from the steps, to the curb, and perhaps even into the street where Mr. Sydnor eventually wrestled the gun from the possession of Mr. Jackson.

It can be presumed that Mr. Jackson, who a moment before had been removing Mr. Sydnor's money through violent means, upon having his handgun taken by the defendant, realized that he had made a mistake in his choice of victims; nonetheless, he continued to attempt to complete the robbery by carrying away Mr. Sydnor's money. He was not fast enough—bullets were faster.

The defendant was not convinced that the robbery was complete because his money and the robber were still on the scene, even though Mr. Jackson was attempting to complete the robbery by asportation. The defendant decided to remain with his money, albeit that his money was in the hands or

pockets of another. The money was still not completely gone from Mr. Sydnor's possession; it had not yet been carried away, so he thought, and so do I. It was right there. And he, Mr. Sydnor, had Mr. Jackson's gun, that had, but mere moments before, been drumming a tune upon his head.

Mr. Sydnor, while attempting to forestall the carrying away of his money and the consummation of the robbery, affirmed his possession of the money, by denying Mr. Jackson the opportunity to immediately carry away the money. In the process, Mr. Jackson got shot with his own gun, several times, and subsequently died.

The activities of the morning of December 9, 1998 took place in an exceedingly short span of time and distance. From the time of the accosting of Mr. Sydnor by Mr. Jackson with the gun, to the report to the police that the shots were fired, less than two minutes passed and less than, in my view, twenty-one feet were traversed.[1] I believe that Mr. Jackson was struck

---

1. I believe the majority is mistaken to the extent it is indicating that the shooting took place forty to fifty yards away from where the robbery began. Yvette Kiah testified that she lived at 922 Chester Street. She testified that she heard people scuffling "across the street. That would be between 901 and 903, across the street from me." She said she then put "stuff" against the window when she heard men running. At that time, she heard gunshots. She then testified that a van was parked in front of her door. She saw the people who had been running. But at that time, the victim was already on the ground. On cross-examination, she again testified that the corner store was "almost immediately across the street." It was suggested that the distance was "about 40 to 50 yards." She responded, "Yup. That's right." In my view, she was testifying, probably erroneously, that the shooting took place forty to fifty yards away, not that the victim ran fifty yards before he was shot, although he may have ran some distance after being shot. A forensic witness for the State, upon prodding, stated that a casing had been found forty yards from the corner store. It is clear, however, that the robbery commenced on the front stoop of a house that defendant was sitting on, not at the corner store, and then moved into or near the street.

Another witness, Ms. Jones, who was actually at the scene of the shooting, described how far the victim ran before he was shot by pointing out a distance in the courtroom. The distance was described by the prosecutor and accepted by the court and the witness, as being fifteen to twenty feet. Ex. Vol. 11, page 88. Later, a crime scene technician testified that clothes and a bullet were found fifty yards from

by the bullets approximately five to probably no more than twenty feet from where the fight for the gun terminated. In the intervals of time and distance between when Mr. Jackson began the robbery and when he was shot, Mr. Jackson had demanded Mr. Sydnor's money at gunpoint, an argument had ensued over whether Mr. Sydnor was willing to relinquish his money, Mr. Jackson then beat the defendant about his head with the gun, and forcibly removed Mr. Sydnor's money. Mr. Jackson then wrestled with Mr. Sydnor for the gun, moving into the street in the process. Upon losing possession of the gun, Mr. Jackson turned and ran probably between sixty and two hundred forty inches before the bullets struck him. After he was shot, he may have run further before he collapsed. In my view, the robbery was ongoing as Mr. Jackson and the stolen money were still in the immediate vicinity and Mr. Sydnor had a right to attempt to retain what was his, using the gun as necessary. He had the right to keep Mr. Jackson from carrying away his money and completing the robbery. That Mr. Jackson had afforded Mr. Sydnor the opportunity to use a gun to forestall the robbery, by bringing the gun to the robbery, should not afford Mr. Jackson the right to carry away the money when he, Mr. Jackson, no longer had the gun. Under the majority's theory, a robber can rob a victim at gunpoint, then hand the gun to the victim and walk away with impunity.

I do not believe that, had Mr. Sydnor tackled Mr. Jackson, and physically, using non-lethal force, asserted his control over his money, that the majority would hold, under the circumstances of this case, that Mr. Sydnor was engaged in a subsequent robbery of Mr. Jackson. In that case, the majori-

---

the corner store, evidence that the scuffling for the gun moved—started at one place and moved down and/or into the street and that the defendant shot the victim as soon as he wrestled the gun from him. Sydnor was asked in his statement to the police where he shot the victim and responded, "Right there at the curb. He ran away across the street." He subsequently testified that the victim was five feet away when he was shot and that the defendant shot Mr. Jackson immediately after he wrestled the gun from him. His statement was introduced over his objection as evidence for the State.

ty would, I believe, hold that the robbery by Mr. Jackson of Mr. Sydnor was not complete, and, under those circumstances, would not hold that Mr. Sydnor was assaulting Mr. Jackson.

I do not believe that the average citizen of Maryland, no matter what their status in life, has to permit themselves to be robbed. Had a bank employee shot a robber leaving from in front of the bank, I have little doubt that the majority would hold that the robbery was still in progress. It should be no different for the average person.

Mr. Sydnor took the means, an appropriate and, unarguably, effective means then available to him, to stop the robbery. I am a believer in the rule of law. But I do not believe that it requires victims of violent crimes to submit to being robbed and beaten at gunpoint, without the right to respond with all necessary force during the act. Had Mr. Sydnor possessed his own weapon, rather than wrestling Mr. Jackson's from him, the majority, presumably, would even then hold that, once Mr. Jackson turned away, Mr. Sydnor could not have then used his gun to reclaim his money even though it was a mere second, and mere feet or even inches, from the time and place where the money was taken. If that is to be the law, it should not be. The law should not be changed to require complacent and compliant victims. Before today, forcible robberies could be resisted with all force.

I believe that the law is better stated in the Kentucky case of *Flynn v. Commonwealth,* 204 Ky. 572, 573, 264 S.W. 1111, 1112 (1924), where the Court said, in relevant part:

> The right to kill in defending against a robbery does not end as soon as there is such a change of possession of the property taken as will render the crime technically complete, but remains with the owner as long as his property is in his immediate presence, and the killing of the robber will prevent it from being taken away.

The Georgia courts have held similarly. In *Crawford v. State,* 90 Ga. 701, 705–06, 17 S.E. 628, 630 (1892), *overruled on other grounds, Moyers v. State,* 186 Ga. 446, 197 S.E. 846 (1938), the Georgia Supreme Court held:

The taking was not a past, but a present and progressing injury; and if the defendant acted under a reasonable belief that the purpose of the taking was robbery, he had the right to arrest it in the manner he did, although there may have already been such a change in possession as would in law amount to a robbery. The right of the owner of property to defend it against a felonious taking, to the extent if necessary of killing the person taking, does not end at the moment the guilt of that person is technically complete. It extends not merely to the prevention of such asportation as may be sufficient to render the person guilty of robbery, and which may be effected by the slightest change of possession, but to the prevention of his carrying off the property which he has thus gotten from the owner. The object of the law being to allow the owner to protect his property against the robber, it would be unreasonable to hold that at the moment such asportation is accomplished, and before the robber has gotten away with the article taken, the right of the owner to defend his property is at an end; and that where the moment before he could have lawfully killed in defense of it, he must yield after the slightest change of possession has been effected, and if he then killed the robber to prevent the article from being carried off, would be guilty of murder.

As I view the facts of the instant case, Mr. Sydnor's money was still in his immediate presence, and he killed Mr. Jackson to prevent it from being "carried" away. The proof is in the evidence. Mr. Jackson's body was probably within fifteen or twenty feet of the place where the physical altercation, which was a part of the robbery, terminated near the curb. Transcripts of the calls to 911 indicated that the shots were heard within two minutes of the initial accosting of Mr. Sydnor by the armed Mr. Jackson.

This is not a case where Mr. Sydnor saw Mr. Jackson on the street a week after the robbery, and shot him in order to get his money back. In the present case, Mr. Jackson had not initially left the scene—in fact he never left it. He was still attempting to complete the robbery, by carrying the stolen

money away, when he was stopped by gunfire. The majority's position apparently is that victims who are robbed by armed force, must do nothing to stop the robber from escaping, once the robber turns away with their money in his hands and takes several steps. The majority does not sufficiently address the fact that robbery is not only a taking of property by force, but it is a forcible taking *and carrying away* of property. At the time he was shot, Mr. Jackson was carrying away property he had, just seconds before, taken by force and at gunpoint.

The majority confuses the law of self-defense, with the different and separate rules relating to the use of force by a victim to prevent a robbery. Doing so primarily by skillfully melding the two concepts together in its discussion. In my view, they are very different concepts and historically have been treated as such. In short, any degree of force can be used to stop a forcible robbery in progress. The law of self-defense discussed by the majority may well be right, in its proper place. However, it simply is not, for the most part, applicable to a forcible robbery in progress, and the combining of two concepts into a self-defense concept, is, I respectfully suggest, inappropriate. The entire law of duty to retreat is out of place in a case of resistance to a forcible robbery. It has heretofore been the law in Maryland that while the forcible robbery continues, it can be resisted with all force available to the victim. Though self-defense is correctly described by the majority—this is not a "self-defense" case. It is a resistance to an ongoing robbery case. It makes no difference whether Mr. Sydnor was still under attack, or whether Mr. Jackson had turned away, as it might in a case of self-defense in an assault case. This is a robbery case—the rules are, and have always been, different.

Although some of the Maryland cases cited by the majority include charges of robbery as collateral charges, not a single case involved the use of deadly force to stymie a forcible robbery. To the extent that self-defense was a part of the cases, it was in its traditional sense, not as it relates to the right to use force, to forestall or prevent the completion of a

forcible robbery. Not a single Maryland robbery case supports the position the majority takes. All of the cases cited by the majority that facially support its position, are traditional self-defense cases.

Additionally, the majority states that *Ball v. State,* 347 Md. 156, 699 A.2d 1170 (1997), *Jackson v. State,* 286 Md. 430, 408 A.2d 711 (1979), and *Watkins v. State,* 357 Md. 258, 744 A.2d 1 (2000), are really not applicable because they stand for the proposition that a "continuous offense" theory only applies when there is a need for a robbery to be continuing so that there is a felony to support a conviction under the felony-murder rule. In my view, such a proposition is unacceptably inconsistent. As indicated, *infra,* a robbery is continuous or it is not. To proffer that a robbery is continuous because the commission of a robbery is needed to support a conviction of felony-murder (murder committed in the course of a robbery), but not continuous when it would support an acquittal of a person defending against the same robbery, is simply, in my view, with all due respect to the majority, unacceptable in terms of consistency, intellectual honesty, fairness, and due process. There should not be differing standards supporting the State's desire for conviction and a defendant's desire for an acquittal. Both the State and the defendant should be subject to the same rules.

The majority holds that the "continuous offense" theory does not expand or trump the general self-defense rule. No one argues that anything is being "expanded" or "trumped." The concepts have coexisted for centuries. One concept applies to robberies in progress, and one applies in other circumstances. What the majority is attempting is to swallow the separate and distinct rule relating to robberies in progress, digest it, and, sufficiently muddled, disgorge it as a new self-defense rule applicable to robberies. It is the majority, in essence, that seeks to limit a pre-existing theory, or to trump it, by holding that the general rule controls the specific. Under the guise of asserting that the concept never existed, or never meant what it was asserted to mean, the majority, for the first time in the history of the State, requires victims to sit

meekly while violent robbers consummate the robbery by carrying away their property. Presumably, businesses, including banks, must, in the future, let robbers walk out the door once they turn away from the cash register or teller's cages.

With the position taken by the majority in this case, Maryland will find itself in the incongruous position of asserting that force used by a robber after the time of the actual taking is sufficient to sustain that a robbery is continuing, but not sufficient to justify the victim's use of force at the identical point in time to regain possession of the property before it is carried away. In *Ball v. State, supra,* Ball, who was in the process of burglarizing a residence when the victim returned home, asserted that he had not committed a robbery because he had already taken the property from the master bedroom when he turned a corner in one of the rooms and ran into the victim, who he then shot and killed. He asserted, therefore, that he had not used force to effectuate the taking of the property, because he killed the victim after he had taken the property. The Court noted that: "Under Appellant's theory, guilt must be assessed as of the exact point in time at which asportation of the property occurs, without regard to any events thereafter." *Id.* at 185, 699 A.2d at 1183. After discussing a case in which the Court of Special Appeals had adopted the "continuing offense" definition of robbery,[2] we noted, after discussing a split in authority among the states, that:

Other courts, in contrast, have interpreted robbery as a continuous transaction that is not complete *until the perpetrator reaches a place of temporary safety. . . .*

. . .

Another suggested justification for the "continuous offense" approach is that when a thief must use force to retain possession of the property, the thief does not acquire full possession of the property until the force or threat of force

---

2.  *Burko v. State,* 19 Md.App. 645, 313 A.2d 864 (1974), *vacated on other grounds,* 422 U.S. 1003, 95 S.Ct. 2624, 45 L.Ed.2d 667 (1975).

overcomes the custodian's resistance to the taking. Stated in other words, a "taking" does not occur until the perpetrator has neutralized any immediate interference with his or her possession. The point of asportation thus is not absolutely determinative.... On the other hand, the crime is continuous and not completed *until the parties have reached temporary safety.*

*Id.* at 185–88, 699 A.2d at 1184–85 (internal citations omitted) (emphasis added). We then adopted the "continuous offense" reasoning, saying, in relevant part: "If, as in the instant case, the use of force enables the accused to *retain possession of the property in the face of immediate resistance from the victim,* then the taking is properly considered a robbery." *Id.* at 188, 699 A.2d at 1185 (emphasis added).

Under the *Ball* holding, if Mr. Sydnor had not wrestled the gun from Mr. Jackson, but had still run after Mr. Jackson to attempt to regain his property, and had Mr. Jackson then shot Mr. Sydnor, the shooting would have been committed during the robbery. But, under the majority's reasoning in the instant case, the reverse is not so. According to the majority, Mr. Sydnor's shooting of Mr. Jackson to stop the robbery is not done in the course of the robbery. Even more incongruous, under the majority's reasoning, would be the situation that would have existed if Mr. Jackson had been in possession of another gun and if Mr. Jackson had engaged in an exchange of gunfire with Mr. Sydnor when Mr. Sydnor attempted to stop Mr. Jackson from carrying away his property. Mr. Jackson would have been shooting at Mr. Sydnor during the robbery under the *Ball* holding, but Mr. Sydnor, under the majority's holding in the instant case, would not have been shooting at Mr. Jackson during the robbery.[3] Does this make any sense?

---

**3.** Presumably, in that circumstance, the majority would hold that Mr. Jackson was shooting during a robbery and Mr. Sydnor was not, but might hold that Mr. Sydnor was acting in self-defense, although the right to self-defense, according to the majority, supposedly would have ceased when Mr. Jackson turned and walked away.

Clearly, Mr. Jackson had not reached a place of temporary safety. He was obviously never safe. Within mere seconds he was shot at the scene of the robbery. He is dead. The robbery was never over. Mr. Sydnor was legally justified in shooting Mr. Jackson during the robbery.

Under the majority's reasoning, a bank robber could rob a bank at gunpoint; walk out of the bank and drop the gun on the sidewalk and the bank's employees could not forcibly recover the money still being carried from the scene. Under its reasoning, Bonnie Parker and Clyde Barrow should have died of old age!

The majority fails to realize that there are times when a shooting is appropriate. This was one of those times. Under the circumstances then and there present, a robbery in progress, it can be argued that Mr. Jackson needed to be shot in order for the robbery, then still in progress, to be stopped. With the majority's position, victims may now be robbed, without the robber having to fear immediate severe resistance, or reprisal. At the same time, the majority is declaring open season on victims.

I dissent. A man or a woman should be permitted to utilize maximum force to resist being forcibly robbed.[4] We should not change the law to provide otherwise.

---

**4.** In footnote 4 of the majority opinion, the Court mischaracterizes the position of the dissent. It is my belief that the law of robbery has always permitted the victims of robbery, unlike the victims in certain other situations, to use not only necessary, but deadly force, to resist a forcible robbery in progress. The Court heretofore has always construed robbery to be a continuing offense, not completed until the robber has reached a place of, or status of, temporary safety. What the majority does in footnote 4, and in the opinion for that matter, is to, for the first time, engraft the general law of self defense onto the law relating to an ongoing robbery offense for which different rules have always applied.

In changing the law, it is retroactively holding the petitioner responsible for a criminal act, which was not a criminal act when committed. In the process, Sydnor will be spending twelve years in prison for an offense that was not an offense at the time it occurred.

While it can be argued that the position of the majority is a proper position to be taken in future instances of resistance to robbery (al-

though I would not make the argument), in my view, it should not be, for obvious reasons, created—after the fact.