744 A.2d 1

Mark Davon WATKINS

v.

STATE of Maryland.

No. 42, Sept. Term, 1999.

Court of Appeals of Maryland.

Jan. 11, 2000.

Mark Colvin, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Thomas K. Clancy, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

WILNER, Judge.

The issue presented to us is one of accomplice liability under the felony-murder doctrine. The assumed factual predicate from which that issue arises is that three persons—Jenkins, Hilliard, and petitioner Watkins—conspired to rob a fourth person, Whittington, that Watkins's role was to serve as a lookout while Jenkins and Hilliard entered Whittington's motel room to commit the robbery, that a struggle ensued between Whittington and Jenkins, leading Jenkins to shoot Whittington, that Jenkins then shot Hilliard, an alleged co-felon, in order to leave no witnesses, and that Watkins and Jenkins then made their escape. Whittington and Hilliard instantly died of their wounds. As we shall see, the assertion that Hilliard was a co-conspirator, and therefore a co-felon, has only the barest foundation.

Watkins was convicted in the Circuit Court for Prince George's County, among other things, of the felony-murder of both Whittington and Hilliard. He does not challenge his conviction for the murder of Whittington but complains that the trial court erred in failing to give a special foreseeability instruction with respect to the felony-murder charge concerning Hilliard. He urges that the deliberate killing of one co-felon by another is not foreseeable and therefore cannot be regarded as being in furtherance of the common scheme. Accordingly, he avers, as a third co-felon who had no direct part in that killing, he cannot be held liable for it under the traditional felony-murder doctrine. He was entitled, he maintains, to have the jury consider whether, from his perspective and as a matter of fact, Jenkins's killing of Hilliard was reasonably foreseeable. The Court of Special Appeals rejected his complaint, *Watkins v. State*, 125 Md.App. 555, 726 A.2d 795 (1999), and so shall we.

## BACKGROUND

On Sunday morning, January 5, 1997, the naked bodies of Whittington and Hilliard were found dead in Room 160 of the Motel–6 motel in Camp Springs, Maryland. Each of them had been shot in the head at close range. Whittington was lying face-down on the floor, between the two beds in the room; Hilliard was face-down on one of the beds, partly covered by a sheet. Whittington was known to have a white Cadillac, which, along with the keys to the car, was missing. Also missing were some gold rings and a watch that Whittington was known to wear. Discovered under one of the beds, however, was $1,156 in cash. Jenkins's fingerprints were found on several items in the room.

Three weeks later, Whittington's car was found in the District of Columbia, about eight to ten blocks from Watkins's home. The car was apparently unlocked, and there was no sign of tampering. Watkins's fingerprints were found on the exterior of the left front door, and that, eventually, led to his arrest in June, 1997.

The evidence indicated that Whittington and Hilliard were homosexual lovers. Whittington had frequently stayed at the Motel–6, and testimony was produced that he and Hilliard had made plans to obtain an apartment together. On the evening of January 4—Watkins said around 8:00 or 9:00—Hilliard moved his belongings from his mother's home into Whittington's car. Jenkins and Watkins were observed helping Hilliard put his property into the car and getting into the back seat of Whittington's car as it left Hilliard's mother's home. That was the last public sighting of any of the men prior to the murders.

Upon his arrest, Watkins was interviewed by several Prince George's County detectives, and he gave a series of materially inconsistent and progressively incriminating statements, some oral and some written. In his initial, oral statement, Watkins admitted to Detective McCann that he knew both Hilliard and Whittington, but he denied knowing who killed them. He confirmed that Whittington often stayed at the Motel–6 and said that Whittington and Hilliard were planning to get an apartment together. He said that he had stayed with Whittington and Hilliard at that motel on Friday night, January 3, that Whittington had nice diamond rings, and that he was known to "flash money around." Watkins later added that he had helped Hilliard move his things into Whittington's car and that Jenkins, whom he knew, was present as well.

Upon further questioning by Detectives McCann and Canales, Watkins made the first of three written statements. In that statement, he denied any role in the robbery and murders. He said that Jenkins had told him on January 4 that he, Jenkins, intended to rob Whittington, that Jenkins later showed Watkins a watch and rings he had taken from Whittington, and that Jenkins acknowledged killing both Whittington and Hilliard, stating that "him and [Whittington] got in a struggle and he didn't want to leave no witnesses to the murder, um, I mean the robbery." A short time later, Watkins confirmed orally to Detective Miller that Jenkins had committed the murders and had killed Hilliard in order not to leave any witnesses. In that statement, he added that Jenkins

had asked him to be a lookout and that he had refused. Watkins said that he had been in Whittington's car about a week before the killings.

After further questioning by Detectives Canales and Miller, Watkins gave a second written statement in which, for the first time, he cast Hilliard as a accomplice to the robbery of Whittington, and not solely a witness. He said that Hilliard had told Jenkins that Whittington carried a lot of money and that Jenkins, Hilliard, and Watkins then conspired to rob Whittington. Jenkins and Hilliard, he said, drove to the motel with Whittington but, during the robbery, Whittington struggled and Jenkins shot him and then Hilliard. Following the shootings, Jenkins took Whittington's rings and watch and left the motel in Whittington's car. Watkins said that, although he served as a lookout, he was not at the motel, but waited at a nearby 7–Eleven store. In this version, he said that Jenkins called him from the motel on the evening of January 4, and stated that he was with Whittington and Hilliard. He asked Watkins to come to a 7–Eleven store near the motel. Watkins and another friend, Matt, obtained a stolen pick-up truck and went to the store to wait for Jenkins, apparently to provide him with transportation. At some point, Jenkins drove by the store in Whittington's Cadillac. Matt dropped Watkins at his (Watkins's) girlfriend's home. Jenkins came by later, showed Watkins the jewelry he had taken from Whittington, and told Watkins that "things got out of hand," that he had killed Whittington and then killed Hilliard to eliminate witnesses. Watkins acknowledged that he knew, when he went to the 7–Eleven, that he was to be the lookout and was to provide a means of escape for Jenkins. He did not anticipate that Jenkins would take Whittington's car. In this statement, Watkins said that he waited at the 7–Eleven store but that he heard gunshots coming from the motel.[1]

---

1. Detective Canales later testified that the 7–Eleven store was about a mile away from the motel and that no reports had been received of hearing any gunshots that night.

Watkins's final written statement was more incriminating, but somewhat ambiguous regarding Hilliard's role. He first said that Jenkins announced a day before the killings his intent to rob both Whittington and Hilliard. In the same statement, however, he said that he, Hilliard, and Jenkins "plotted to rob [Whittington]." Watkins said that Jenkins, Hilliard, Matt, and he went to the motel, that Watkins waited outside the room as a lookout while Jenkins and Hilliard went into the room to rob Whittington, that Watkins was standing right next to the door and could hear what occurred inside, that he heard Jenkins tell Whittington, "give me the money," that Whittington struggled with Jenkins, and that Jenkins "started shooting," that Jenkins came out with a gun, got into Whittington's car, and drove away, and that he then entered the room and saw the victims.

There were, of course, many discrepancies in these various statements, mostly bearing on the degree of Watkins's participation, and there were further discrepancies between the statements and otherwise unchallenged extrinsic evidence.[2] Watkins and Jenkins were seen by an independent witness, with Hilliard and Whittington, in the back of Whittington's Cadillac, heading toward the motel with Hilliard's property. As noted, Watkins put this trip at around 8:00 or 9:00 on the evening of January 4. Watkins's first statements indicate that he did not go to the motel but was called later by Jenkins to come to the 7–Eleven, although his last statement has the four of them proceeding together to the motel, with Matt following in a pick-up truck. Although he wavered as to whether Hilliard—Whittington's friend and apparent lover, with whom he was about to cohabit—was part of the conspiracy to rob Whittington, he was consistent throughout that Jenkins had informed him that Hilliard was killed in order to eliminate any witnesses to the robbery or murder of Whittington. The uncontradicted evidence, in other words, was that, whether or

---

**2.** Watkins presented no defense, other than to challenge some of the State's evidence. One of his principal arguments was that the statements he gave were involuntary and should not be credited. That issue is not before us.

not Hilliard was part of the conspiracy to rob Whittington, he was killed because he was a witness.

Apart from that, Watkins's statement that Hilliard was part of the conspiracy, that Hilliard accompanied Jenkins to the motel, and that he entered the room with Jenkins for the purpose of robbing Whittington, is wholly inconsistent with the unchallenged testimony and photographic evidence that Hilliard was stark naked, lying face-down on the bed, when his body was discovered. In order to find that Hilliard was an accomplice in the manner described by Watkins in one of his several inconsistent statements, the jury would have to have found (1) that he accompanied Jenkins to the motel, on the evening of January 4, while naked, or (2) that he stripped and lay down on the bed after entering the room, while Jenkins was supposedly struggling with Whittington, or (3) that Jenkins stripped Hilliard before or after the killings. The suggestion that Hilliard was an accomplice, in other words, at least in the manner asserted by Watkins, borders on the preposterous and hinges solely on one of Watkins's several inconsistent statements that he contended were involuntary in any event.

The issue now presented to us by Watkins arose initially during the course of argument on Watkins's motion for judgment of acquittal. Relying to a large extent on *Mumford v. State*, 19 Md.App. 640, 313 A.2d 563 (1974), he contended that, as Hilliard was an accomplice in the robbery of Whittington, it was not foreseeable that Jenkins would kill Hilliard and that he could not, therefore, be an accomplice to that murder. Apparently accepting the State's argument that, with Watkins's conflicting statements on the matter, Hilliard's status as an accomplice was in dispute and for the jury to resolve, the court denied the motion. When dealing then with proposed jury instructions, Watkins requested a "Mumford type instruction." He did not present to the court any particular instruction but apparently had in mind the kind of instruction that the Court of Special Appeals held should have been given in *Mumford*—that, if the jury were to find that Watkins could not have anticipated that Jenkins would kill Hilliard, it must

acquit him of Hilliard's murder. The court refused to so instruct.

The court guided the jury both through instructions from the bench and in the form of a verdict sheet. In its instructions, the court told the jury that the State was proceeding against Watkins on a theory of accomplice liability, that "when two or more persons participate in a criminal offense, each is responsible for the commission of the offense and for any other criminal acts *done in furtherance of the commission of the offense* or the escape therefrom for each offense committed." (Emphasis added). It emphasized that, in order to establish liability for other crimes committed during the commission of the principal offense, the State must establish that Watkins was an aider and abettor in the principal offense and that "the charged offense was done in furtherance of the commission of the principal offense or the escape therefrom." These general instructions were given more particular focus on the verdict sheet. Question 2, directed at the robbery of Whittington, asked whether Watkins or another participating together and in concert with him robbed Whittington by use of a deadly or dangerous weapon. Question 5, which dealt specifically with the murder of Hilliard and to which no objection was lodged, asked whether Watkins "or an accomplice commit[ted] robbery with a deadly or dangerous weapon (see Question 2) and, if so, did [Watkins] or an accomplice shoot and kill [Hilliard] incidental to or during the course of the robbery." As noted, the jury returned a verdict of guilty in response to that question.

## DISCUSSION

As the focus of attention in the trial court (and, to a large extent, in Watkins's brief in this Court), was on *Mumford v. State, supra,* we shall begin there. Mumford, a 15–year old girl, and four male confederates broke into a farmhouse for the purpose of stealing what was there. While Mumford and one of the boys were rummaging through the unoccupied house, the other two boys went into a garage located about 30 yards away. The owner, a 66–year old woman, returned home

and parked her car in the garage while the boys were there. They grabbed and raped her, and, during the rape, one or both of them strangled her to death. There was no evidence that Mumford had any knowledge of what occurred in the garage until informed by the police the next day, but she was nonetheless charged with and convicted of the felony-murder of the victim, the State's theory being that the murder arose from the burglary enterprise in which she was engaged. She asked for, and was denied, an instruction that, if the jury were to find that she could not have expected her companions to commit a rape and that the victim died as a result of a rape, it must find her not guilty of murder.

Relying on a statement from 1 WHARTON, CRIMINAL LAW AND PROCEDURE, § 252, at 547 (Anderson ed.1957) that "[t]here is no criminal liability on the part of the others when the homicide was a fresh and independent product of the mind of one of the confederates, outside of, or foreign to, the common design," the Court of Special Appeals held that, under the felony murder doctrine, there must be a direct causal connection between the homicide and the felony: "Something more than mere coincidence in time and place between the two must be shown; otherwise, the felony-murder rule will not be applicable." *Mumford v. State, supra,* 19 Md.App. at 644, 313 A.2d at 566. Noting, then, that there was medical evidence that the victim's death ensued *from the rape,* the court concluded that, had the instructions as to felony murder "included a requirement of causal nexus between the underlying felony and the resultant homicide, the jury could have chosen not to believe that death occurred pursuant to the burglary, but rather from rape, fresh and independent of the common design." *Id.* For that reason, it reversed the murder conviction against Ms. Mumford.

■ *Mumford* was a correct decision, on the facts presented in that case. When there is a legitimate dispute over whether the killing was sufficiently in furtherance of the common enterprise to be chargeable to each of the co-felons, an issue of fact is presented for the jury, under proper

instructions, to resolve. The question of when such a legitimate dispute is presented, however, requires some further analysis.

Maryland Code (1996 Repl.Vol.) Article 27, § 410 declares that murder committed in the perpetration of, or attempt to perpetrate, robbery and certain other enumerated felonies constitutes murder in the first degree. Under Maryland common law, a homicide arising in the commission of such a felony is murder "whether death was intended or not, the fact that the person was engaged in such perpetration or attempt being sufficient to supply the element of malice." *Jackson v. State*, 286 Md. 430, 435, 408 A.2d 711, 715 (1979). That substituted form of malice represents, in a way, a vertical extension of the normal requirement that, for a homicide to constitute murder, the defendant must intend to kill the victim. It has also long been established that, under the felony-murder doctrine, a participating felon is guilty of murder when a homicide has been committed by a co-felon in furtherance of the underlying felony. *See Campbell v. State*, 293 Md. 438, 442, 444 A.2d 1034, 1037 (1982) and cases cited there. That extension, which invokes the rule of accomplice liability, is, in essence, a horizontal one, making culpable other persons, who did not actually commit the homicide and who may, in fact, have earnestly desired that it not have happened. The more difficult issue has been in defining any limits to these two extensions.

We dealt with that issue in *Jackson* and in *Campbell*, the broader discussion being in *Campbell*. In *Jackson*, the defendants, foiled in a robbery attempt, forced the two victims, as hostages, into a car and fled recklessly from a high-speed police chase. The tragedy occurred when a police officer, in an attempt to disarm one of the robbers, accidentally discharged his shotgun into the car, killing one of the hostages. The question was whether the defendants could properly be convicted of the felony-murder of that hostage, when neither of them fired the fatal shot. Quoting from 1 WHARTON'S CRIMINAL LAW, § 68 (Anderson ed.1957), we accepted the basic

premise that a person is criminally liable only for what he or she has caused and that there must be a causal relationship between the person's act and the harm sustained, but we accepted as well the fact that it "is not essential to the existence of a causal relationship that the ultimate harm which has resulted was foreseen or intended by the actor," that the defendant "personally inflict harm upon the victim," or that the defendant's act "be the sole reason for the realization of the harm which has been sustained by the victim." *Jackson, supra,* 286 Md. at 441–42, 408 A.2d at 718. Essentially on that basis, we concluded that the victim's death from the lethal shot of the officer was legally attributable to the defendants, who put the victim in the position of grave danger, and that they therefore were properly convicted of felony-murder, although neither of them was the direct, immediate cause of his death. *Id.* at 443, 408 A.2d at 719.

*Campbell* also arose from an armed robbery attempt, but there it was one of the robbers who ended up dead, shot to death either by a police officer or the robbery victim. The question was whether the killing of the co-felon by a third party in the course of opposing the robbery or in an attempt to apprehend the perpetrators constitutes first degree murder on the part of the surviving co-felon. We held that, ordinarily, it does not.

We began our analysis by recalling, from *Jackson v. State, supra,* 286 Md. 430, 435, 408 A.2d 711, 715, the basic felony-murder doctrine: "at common law, homicide arising in the perpetration of, or attempt to perpetrate, a felony is murder whether death was intended or not, the fact that the person was engaged in such perpetration or attempt being sufficient to supply the element of malice." *Campbell, supra,* 293 Md. at 442, 444 A.2d at 1037. We noted then the well-established rule that, under the felony-murder doctrine, "a participating felon is guilty of murder when a homicide has been committed *by a co-felon.*" *Id.* (emphasis added). We observed, however, that, as to the issue then presented, a majority of the courts that had considered the question had held that, under the felony-murder doctrine, "a participating felon is not guilty of

murder when the killing is done by a person other than the participating felon or his co-felons." *Id.* at 443, 444 A.2d at 1037.

The rationale for that approach was the "agency theory" of felony-murder, a "classic statement" of which appeared in *Commonwealth v. Campbell*, 89 Mass. 541 (1863). In that case, the Massachusetts court confirmed that "a person engaged in the commission of an unlawful act is legally responsible for all the consequences which may naturally or necessarily flow from it, and that, if he combines and confederates with others to accomplish an illegal purpose, he is liable *criminaliter* for the acts of each and all who participate with him in the execution of the unlawful design. As they all act in concert for a common object, each is the agent of all the others, and the acts done are therefore the acts of each and all." *Id.* at 543. The Massachusetts court noted, however, that the agency theory carries with it a limitation, namely, that "the particular act of one of a party for which his associates and confederates are to be held liable must be shown to have been done for the furtherance or in prosecution of the common object and design for which they combined together." *Id.* Without that limitation, the court observed, "a person might be held responsible for acts which were not the natural or necessary consequences of the enterprise or undertaking in which he was engaged, and which he could not either in fact or in law be deemed to have contemplated or intended." *Id.*

That limitation was also noted in *Commonwealth v. Redline*, 391 Pa. 486, 137 A.2d 472 (1958), where, applying the agency theory, the Pennsylvania Supreme Court stated:

> "The mere coincidence of homicide and felony is not enough to satisfy the requirements of the felony-murder doctrine. 'It is necessary ... to show that the conduct causing death was done in furtherance of the design to commit the felony.'

> \* \* \*

> [I]n order to convict for felony-murder, *the killing must have been done by the defendant or by an accomplice or*

*confederate or by one acting in furtherance of the felonious undertaking.*"

*Id.* at 476 (emphasis in original) (internal citations omitted).

Under that approach, which spreads a broad net of accomplice liability for murder committed by co-felons as a natural or necessary consequence of the joint enterprise, but which limits that vicarious liability to only those kinds of murder, killings committed by other persons—law enforcement officers, victims, or bystanders—in an attempt to thwart or oppose the enterprise do not impose criminal liability on the participating felons because they are not ordinarily regarded as being in furtherance of the common object, but rather are in opposition to it.

We observed in *Campbell* that some courts had used a different theory—the "proximate cause" theory—to impose liability for homicides committed during the enterprise by persons other than the co-felons, but, upon review of the decisions, we determined that the trend had been for the courts to apply the agency theory and limit culpability under the felony-murder doctrine "to lethal acts committed by the felons themselves or their accomplices. . . ." *Campbell, supra,* 293 Md. at 449, 444 A.2d at 1040. That is the approach we too adopted. An extension of the doctrine in accordance with the "proximate cause" theory, we said, would not further the basic purpose of the doctrine, of "deterring felons from killing by holding them strictly responsible for killings they or their co-felons commit." *Id.* at 450, 444 A.2d at 1040. Moreover, we concluded that a proximate cause analysis, which was appropriate for purposes of tort liability, had no proper place in prosecutions for criminal homicide; it was too broad and comprehensive. We thus held that, under the felony-murder doctrine, criminal culpability would continue "for all lethal acts committed *by a felon or an accomplice acting in furtherance of a common design,*" but would not be imposed for "lethal acts of nonfelons that are not committed in furtherance of a common design." *Id.* at 452, 444 A.2d at 1042 (emphasis added).

Accepting this agency theory and the accompanying requirement that, to impose liability on a co-felon under the felony-murder doctrine, the killing have been done in furtherance of the common object, Watkins conjures up a variety of possible explanations for why Jenkins may have killed Hilliard other than as part of the common enterprise, none of which are supported in the least by any evidence in the case, and points then to two cases and a commentator's hypothesis as authority for his view that, if properly instructed, the jury might have found no liability on his part for Hilliard's murder. The cases he relies upon are *Rex v. Plummer*, Kel. 109, 84 Eng. Rep. 1103 (K.B.1700) and *People v. Sobieskoda*, 235 N.Y. 411, 139 N.E. 558 (1923), supplemented by a reference to 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.5 at 212 (1986).

The principle established in the two cases and illustrated by LaFave and Scott is that, if several persons join together in a felonious enterprise and co-felon A, for a wholly independent purpose of his own, not part of, or in furtherance of, the common scheme and not reasonably anticipated by the remaining co-felons, kills co-felon B, the other co-felons are not liable, under the felony-murder doctrine, for that murder. In *Rex v. Plummer*, eight people joined together to smuggle wool from England to France. The King's agents, alerted to the scheme, attempted to seize the wool as it was being transported toward the sea. One of the co-felons fired a shot that hit and killed a co-felon, and the issue arose whether the other co-felons were chargeable with that murder. The appellate court considered a number of possibilities. If the shot was deliberately fired at the King's agents and accidentally hit a co-felon, all would be guilty of felony-murder, for shooting at those agents would have been in furtherance of the enterprise. If the shot was fired accidentally, the same result would ensue. Only if the shooter fired the shot at the co-felon out of particular malice directed toward that person would there be no liability, for in that circumstance the murder would not "be done in prosecution of that unlawful act, but it may be upon another account, and those who are in the unlawful act, not

knowing of the design that killed the other his companion cannot be guilty of it." *Id.* at 1105. The killing, said the court, "must be in pursuance of that unlawful act, and not collateral to it." *Id.*

LaFave and Scott's example, cited by Watkins, is to the same effect. If *A, B,* and *C* undertake to rob *X* and, in the process, *B* accidentally kills either *X* or *C, A* is guilty of felony-murder. If, however, *B,* angry at *C*'s inept manner of assisting in the robbery of *X,* intentionally shoots *C,* "*B*'s intentional shooting of *C* is so far removed from the common plan as not to make *A* responsible for *B*'s intent-to-kill murder." LaFave & Scott, *supra,* § 7.5 at 212. The reason is that "*B*'s conduct had nothing to do with furthering the robbery, the only connection between the robbery and the shooting being a mere coincidence of time and place." *Id.*

▪ *People v. Sobieskoda, supra,* 235 N.Y. 411, 139 N.E. 558, establishes the same proposition, although, on the particular facts of that case, we may not have arrived at the same result.[3] That case, and later New York cases, have made clear that "[e]ven when the homicide is committed by one of the persons engaged in the underlying felony, if that person acts for a private purpose unrelated to the felony, the remaining members of the group are not liable for the murder." *People v. Lewis,* 111 Misc.2d 682, 444 N.Y.S.2d 1003, 1005–06 (1981) (citing other cases, including *Sobieskoda* ).

We concur in that view. It necessarily follows from the agency theory of liability adopted by us in *Campbell* and confirmed in *State v. Stouffer,* 352 Md. 97, 116, 721 A.2d 207, 216 (1998): there must be some nexus between the killing and the underlying felony. Mere coincidence between the underlying felony and the killing is not enough; the conduct causing death must be in furtherance of the design to commit the felony. Decisions to the contrary, that impose liability under the felony-murder doctrine for *any* killing committed during

---

3. *Sobieskoda* was a split decision. Judge Cardozo and Judge Crane dissented.

the commission of the underlying felony as a felony-murder, arise from either a proximate cause analysis that we have rejected or from a strict liability notion that is equally inconsistent with an agency theory of culpability. *See, for example, People v. Cabaltero,* 31 Cal.App.2d 52, 87 P.2d 364 (1939), reviewed and criticized in Norval Morris, *The Felon's Responsibility for the Lethal Acts of Others,* 105 U. PA. L. REV. 50, 71–74 (1956).

▮ Acceptance of the view that there must be some connection, beyond mere coincidence of time and place, between the joint undertaking and the killing does not assist Watkins in this case. As we have indicated, apart from the exceedingly tenuous evidence that Hillard was, indeed, a co-felon, the uncontradicted evidence, from Watkins's own lips, was that Hilliard, whether or not a co-felon, was killed because he was a witness. The killing of a witness, for the purpose of eliminating the person as a witness, is necessarily in furtherance of the common enterprise, whether the victim is the victim of the underlying felony, an innocent bystander, or a co-felon whom the actor desires to eliminate as a potential witness. Actual foreseeability is not the test; there is a range of conduct that the law regards as implicitly foreseeable, whether or not the prospect of that conduct was ever actually anticipated. An accidental killing may not be actually anticipated by all of the co-felons; resistance by the victim or by others and the killing of a person who resists may not be actually anticipated by all of the co-felons. Yet those are consequences that "naturally or necessarily flow" from the felonious enterprise, and vicarious liability has long existed in those situations, whether or not the particular co-felon actually anticipated what occurred. The same is true with respect to the killing of witnesses, as witnesses.

The instructions given in this case fairly and adequately focused the jury on what the State needed to prove—that the killing of Hilliard was "in furtherance" of the robbery of Whittington. That is all that it needed to find in order to convict Watkins of the felony-murder of Hilliard.

JUDGMENT OF COURT OF SPECIAL APPEALS AF-FIRMED, WITH COSTS.