55 A.3d 25

**Warren Jerome YATES**

v.

**STATE of Maryland.**

No. 8, Sept. Term, 2012.

Court of Appeals of Maryland.

Oct. 23, 2012.

114

Lauren K. Collogan, Assigned Public Defender (Williams & Connolly LLP, Washington, DC), on brief, for petitioner.

Daniel J. Jawor, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BARBERA, J.

A stray bullet, fired at a fleeing drug buyer who attempted to trick a dealer by paying with fake bills, killed an innocent bystander. Petitioner, Warren Jerome Yates, was convicted

by a jury sitting in the Circuit Court for Baltimore County of second-degree felony murder, distribution of marijuana, and related offenses in connection with the death of that bystander and the failed drug transaction that preceded it.

The Court of Special Appeals, in a reported opinion, affirmed the judgments of conviction. *Yates v. State*, 202 Md. App. 700, 33 A.3d 1071 (2011). We granted a writ of certiorari to address Petitioner's claims that the Court of Special Appeals erred in (1) holding that the trial judge's error in admitting hearsay evidence that Petitioner admitted committing the shooting was harmless; (2) adopting the *res gestae* theory of second-degree felony murder in affirming that conviction; and (3) declining to exercise plain error review of a jury instruction. For reasons we shall explain, we reject each of Petitioner's claims of error and affirm.

I.

On the night of January 7, 2009, Shirley Worcester was standing outside her home in Middle River, Maryland, when she was fatally wounded by a stray gunshot. Moments earlier, Worcester had stepped outside of her home to take two trash bags to the curb. Worcester's sister-in law, Linda Fuller, was sitting in a car parked in the driveway talking with Worcester when she heard what sounded like a car backfiring. "I've been hit," Worcester said. Fuller and her husband got out of the vehicle and saw a man, wearing a dark hooded sweatshirt with the hood pulled up over his head, fall in Worcester's yard around the same time as the gunshots went off. The man ran off between houses, and Worcester's relatives called 911. Worcester later died from the gunshot wounds.

Police responding to the 911 call stopped a suspicious-looking man, later identified as Petitioner's co-defendant, Donald Kohler, not far from the scene of the shooting. Police investigation revealed that Kohler, the hooded man who fell in Worcester's yard and then ran off, was the gunman's intended

target and Worcester was the innocent victim of an errant shot.

The shooting was preceded minutes earlier by a drug transaction between Kohler and Petitioner. It developed at trial that Kohler had contacted Christopher Jagd and Justin Wimbush seeking to buy four pounds of marijuana. The men in turn contacted Petitioner, who agreed to sell Kohler the drugs. Kohler, Petitioner, and their associates met at another individual's home to conduct the transaction. Petitioner was accompanied by William Griffin. Petitioner presented the marijuana to Kohler and received from him a bag that appeared to contain the purchase money. Immediately after the exchange, Kohler ran from the house, and Petitioner, after glancing in the bag and learning it contained fake currency, chased after Kohler carrying a handgun. Investigators deduced that, during the chase, Petitioner fired at Kohler, missed him, and the stray bullet struck Worcester, wounding her fatally.

Petitioner and Kohler were jointly tried before a jury for their roles in the drug transaction and subsequent shooting. According to several witnesses, Kohler had come to the drug transaction wearing a hooded sweatshirt and all black clothes, similar to the description given to police of the clothing worn by the man who fell in the yard and ran off between buildings after Worcester was shot. In the vicinity of the shooting, police found two shell casings and a trash bag containing four plastic bags filled with marijuana.

Two of the men present for the drug transaction were called as State's witnesses and connected Petitioner to the shooting. Christopher Jagd initially testified that he did not see Petitioner fire the gun, but later acknowledged that he remembered seeing Petitioner pointing the gun, moving it to the side, and firing. Jagd further testified that Petitioner had told him either that he, Petitioner, "got him," referring to Kohler, or that he did not know if he had "got him." William Griffin similarly testified that Petitioner told Griffin he fired the gun but did not know "if he hit anybody or nothing." In addition,

Detective Sekou Hinton testified, over defense objection, that Jagd told him that Petitioner had confessed to the shooting. Specifically, Jagd told the detective that Petitioner had said to Jagd, "I popped that nigga." Jagd, however, denied at trial that Petitioner had made that statement to him.

The jury returned a verdict on October 9, 2009. The jury acquitted Petitioner of first-degree murder and found him guilty of second-degree felony murder, use of a handgun during the commission of a felony, use of a handgun during the commission of a violent crime, drug trafficking with a firearm, distribution of marijuana, conspiracy to distribute marijuana, and first-degree assault. For sentencing purposes, the trial court merged distribution of marijuana with second-degree felony murder and merged together the two handgun convictions. For the remaining crimes, the court sentenced Petitioner to a total of ninety-five years' imprisonment.

Petitioner noted an appeal to the Court of Special Appeals. That court, rejecting Petitioner's multiple claims of reversible error, affirmed the judgments of conviction. *Yates*, 202 Md. App. at 704, 33 A.3d 1071.

Petitioner filed with this Court a writ of certiorari to answer the following questions:

1. Did the Court of Special Appeals err in concluding that the improper admission of hearsay describing Mr. Yates's alleged confession was harmless error?

2. Did the Court of Special Appeals err in adopting the *res gestae* theory of second-degree felony murder in sustaining Mr. Yates's conviction?

3. Did the Court of Special Appeals abuse its discretion in declining to exercise plain error review of a jury instruction solely on the grounds that the instruction was consistent with a Maryland Criminal Pattern Jury Instruction?

We granted the petition, *Yates v. State*, 425 Md. 396, 41 A.3d 571 (2012). We answer "no" to each of the questions presented.

## II.

■ On cross-examination of Detective Hinton by Kohler's defense counsel, Detective Hinton was asked what Jagd had told him Petitioner had said after the shooting.

[Kohler's Counsel]: And my question to you is this: When you spoke with Mr. Jagd, you discussed with him what it was that he said that [Petitioner] had said to him immediately after the shooting as they were running into the house. I want to call your attention to that discussion that you had with him. Can you tell us what it is that Mr. Jagd told you that [Petitioner] said to him?

* * *

[Hinton]: He said, I popped that nigga.

The trial court allowed the statement into evidence, over Petitioner's objection. Petitioner moved for a mistrial, and the trial court denied the motion.

The State conceded before the Court of Special Appeals (and repeats that concession here) that Detective Hinton's testimony, repeating what Jagd told him that Petitioner said to Jagd, was inadmissible hearsay.[1] The State argued, though, that Petitioner was not entitled to reversal of his convictions on that ground because the error was "harmless error." The Court of Special Appeals agreed that the trial court erred, yet held, by application of the test for "harmless error" set forth in *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976),[2] that the error did not entitle Petitioner to reversal of

---

1. The challenged testimony is actually "hearsay within hearsay," as Detective Hinton relayed a statement that Jagd made to him relaying a statement that Petitioner originally made to Jagd. Under Maryland Rule 5–805, "If one or more hearsay statements are contained within another hearsay statement, each must fall within an exception to the hearsay rule in order not to be excluded by that rule."

2. In *Dorsey v. State,* 276 Md. 638, 658–59, 350 A.2d 665 (1976), we adopted the following standard, drawn largely from *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), for determining whether an error at trial was harmless:

his convictions. *Yates,* 202 Md.App. at 708–09, 711, 33 A.3d 1071.

Petitioner challenges that holding, arguing that the Court of Special Appeals misapplied the *Dorsey* test by not considering the impact the hearsay evidence had on the jury and by instead improperly examining whether the State relied on the hearsay statement in its closing argument. Additionally, Petitioner contends that the hearsay statement was not cumulative of other evidence offered at trial. The State disagrees, asserting that the Court of Special Appeals correctly held that Petitioner is not entitled to reversal on the basis of the trial court's evidentiary error. We agree with the State.

"This Court has long approved the proposition that we will not find reversible error on appeal when objectionable testimony is admitted if the essential contents of that objectionable testimony have already been established and presented to the jury *without objection* through the prior testimony of other witnesses." *Grandison v. State,* 341 Md. 175, 218–19, 670 A.2d 398 (1995) (citing *Jones v. State,* 310 Md. 569, 589, 530 A.2d 743 (1987), *vacated on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916, *on remand,* 314 Md. 111, 549 A.2d 17 (1988)). In *Jones,* we considered whether a detective's testimony about how an attempted murder victim identified Jones as her assailant in an early interview and in a later photo array was inadmissible hearsay and unduly prejudicial. 310 Md. at 588, 530 A.2d 743. Given that the victim testified without objection at trial that she identified Jones as the assailant to police, we held: "Where competent evidence of a matter is received, no prejudice is sustained where other objected to evidence of the same matter is also received." *Id.*

---

[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

at 588–89, 530 A.2d 743. *See also DeLeon v. State,* 407 Md. 16, 30–31, 962 A.2d 383 (2008) (holding that a defendant waived an objection to what he claimed was irrelevant and highly prejudicial testimony about his purported gang affiliation because "evidence on the same point [was] admitted without objection" elsewhere at trial); *Berry v. State,* 155 Md.App. 144, 170, 843 A.2d 93 (holding that the admission of testimony from a detective stating that other defendants were charged alongside Berry, but being tried separately, was not reversible error because "the essential contents of that objectionable testimony" had been admitted earlier, without objection, through other witnesses), *cert. denied,* 381 Md. 674, 851 A.2d 594 (2004).

We agree with our colleagues on the Court of Special Appeals that Detective Hinton's statement is cumulative of other evidence to which Petitioner did not offer an objection, and we affirm the intermediate appellate court on that ground.[3] Two other witnesses, Jagd and Griffin, testified that Petitioner admitted to them that he fired his gun. Jagd initially testified that he saw the gun when Petitioner ran out the door, but he "didn't see the shots." After being reminded of his statement given to police, Jagd agreed that he saw Petitioner "point like he was going to shoot and then move the gun to the side before he fired." Jagd further testified that Petitioner admitted to him that he fired the gun, but Jagd could not recall exactly what was said during the conversation. The following exchange occurred during cross-examination of Jagd by the co-defendant Kohler:

[Kohler's Counsel]: Do you remember what [Petitioner] said to you?

[Jagd]: Nah. I said something to him. I said, did you shoot him? I don't remember exactly what he said. I think he said, I don't know if I got him, or something around that, or I think I got him. I'm not sure.

---

3. We therefore have no need to address Petitioner's claim that the Court of Special Appeals misapplied the *Dorsey* standard of harmless error.

[Kohler's Counsel]: Are those his exact words?

[Jagd]: No, sir.

\* \* \*

[Kohler's Counsel]: Do you remember saying to Detective Hinton that [Petitioner] said to you, quote, I popped that nigger?

[Jagd]: No, he didn't say that.

[Kohler's Counsel]: He didn't say that. You didn't say that to Detective Hinton?

[Jagd]: I might have.

Petitioner did not object to this exchange.

Griffin similarly testified, without objection from Petitioner, that Petitioner admitted to firing a gun. Griffin testified, "I asked him what happened with the gunshots. He said he fired the gun." Griffin later added, "[Petitioner] just said he don't know what happened or if he hit anybody or nothing."

Petitioner argues that these additional statements about Petitioner's firing a gun are not cumulative because they are not of the same quality as the statement relayed by Detective Hinton. Petitioner cites *State v. Simms*, 420 Md. 705, 739–40, 25 A.3d 144 (2011), for the proposition that erroneous evidence is not cumulative if it is of a "different quality" than other admitted evidence. As Petitioner sees it, his supposed admission to Jagd that he "popped that nigga" was "far more powerful" than the other statements admitted at trial because the statement was callous and made it seem as if Petitioner had "coolly bragged" about the crime. Petitioner argues that it is not merely the content but also the manner in which that content is delivered that matters to whether the evidence is cumulative. Petitioner noted in oral argument before this Court that the statement came from the testimony of Detective Hinton, a police officer "who is more likely to be credited by the jury" than the individuals involved in the drug deal with Petitioner. Petitioner maintains that the detective's hearsay statement bolsters the testimony of both Griffin and Jagd, giving added credence to their version of events. *See*

*Newman v. State,* 65 Md.App. 85, 98, 499 A.2d 492 (1985) (holding that improper admission of a prior consistent statement was not harmless error when it bolstered a witness's testimony), *cert. denied,* 305 Md. 419, 504 A.2d 1152 (1986). A boastful, unambiguous statement that Petitioner "popped" someone, Petitioner contends, would have more of an impact on the jury than Petitioner's statements that he was unsure if he hit anyone.

We disagree. The substance of Detective Hinton's statement is that Petitioner told Jagd that he fired a gun and shot someone. Jagd separately testified that Petitioner said "I don't know if I got him" or "I think I got him," even while he denied (to some extent) making the provocative statement to Detective Hinton. In addition, Jagd testified that he saw Petitioner run out of the house with a gun and saw Petitioner discharge it. Griffin testified similarly that Petitioner fired the gun and said to Griffin that he, Petitioner, was not sure if he hit anyone. These statements, although using different words, reach the same conclusion: that Petitioner fired a gun shortly after chasing Kohler out of the house.

Petitioner places too great an emphasis on the fact that the challenged hearsay statement came through Detective Hinton. It is conceivable that the jury found Detective Hinton more credible than Jagd and concluded that Detective Hinton correctly recalled what Jagd had said. But in order to convict Petitioner, the jury would have had to believe not only that Detective Hinton was correct in remembering Jagd's statement to him, but that Jagd himself was credible in relating to the detective what Petitioner told him. For the jury to believe that the statement was credible it would need to believe both Detective Hinton *and* Jagd. Ultimately, though, the jury would had to have focused on the credibility of Jagd and Griffin in connection with their statements implicating Petitioner. There were three such statements: two from Jagd (one relayed through Detective Hinton) and one from Griffin. Jagd testified that Petitioner ran out of the house with a gun and fired in the direction of Kohler. Both Jagd and Griffin testified that Petitioner admitted that he fired his

gun and thought he hit something or was unsure if he hit something. In the words of *Grandison*, this testimony establishes the "essential contents" of the hearsay from Jagd that Detective Hinton repeated to the jury. 341 Md. at 219, 670 A.2d 398.

We agree with the Court of Special Appeals that the admission of the hearsay evidence did not ultimately affect the jury's verdict given the cumulative nature of the similar statements offered at trial. We therefore hold that the erroneous admission of the hearsay statement from Detective Hinton does not entitle Petitioner to a new trial.

### III.

■ Petitioner argues that the evidence was insufficient to convict him of second-degree felony murder because the State failed to prove all of the elements of the offense, specifically that the killing occurred during the perpetration of the felony. Petitioner argues that the predicate felony—distribution of marijuana—had concluded before the murder was committed and therefore cannot serve as the basis for a felony murder conviction. In that regard, Petitioner takes issue with the Court of Special Appeals's statement that "a killing that follows a felony constitutes felony murder if the homicide and the felony were parts of one continuous transaction, and they were closely related in time, place, and causal relation." According to Petitioner, this statement is contrary to Maryland Code (2002, 2012 Repl.Vol.), § 2–201 of the Criminal Law Article, which defines first-degree felony murder as being "committed in the perpetration of or an attempt to perpetrate" certain enumerated felonies. Petitioner views the Court of Special Appeals's analysis as an adoption of the *res gestae* theory and a consequent impermissible "significant expansion" of Maryland's felony murder doctrine.[4] We do not agree.

---

4. The *res gestae* (meaning "things done") theory "embraces not only the actual facts of the transaction and the circumstances surrounding it, but the matters immediately antecedent to and having a direct causal connection with it, as well as acts immediately following it and so

We first dispose of Petitioner's concern with the Court of Special Appeals's reference to the phrase *res gestae* in the course of surveying the law in other states on the subject of felony murder, 202 Md.App. at 714–18, 33 A.3d 1071, and the Court's statement of "agree[ment] with this line of cases." *Id.* at 718, 33 A.3d 1071. Insofar as our research discloses, we have not formally adopted the phrase *res gestae* in explicating the scope of the felony murder doctrine. Regardless, we do not disagree with the Court of Special Appeals's expression of the Maryland law of felony murder, and we are in full accord with our colleagues' application of that law to hold that the evidence developed at Petitioner's trial meets the test for legal sufficiency of the felony murder conviction. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (stating that the test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"); *accord State v. Mayers*, 417 Md. 449, 466, 10 A.3d 782 (2010).

Felony murder is defined under Maryland common law as "a criminal homicide committed in the perpetration of or in the attempted perpetration of a dangerous to life felony." *Roary v. State*, 385 Md. 217, 232, 867 A.2d 1095 (2005); *accord Metheny v. State*, 359 Md. 576, 623, 755 A.2d 1088 (2000); *Deese v. State*, 367 Md. 293, 305, 786 A.2d 751 (2001) (stating that, to "qualify as a basis for second degree felony murder," the "victim's death, of course, must be '*caused* during the commission of, or attempt to commit,' the underlying felony" (citation omitted)). The crime retains its common law defini-

closely connected with it as to form in reality a part of the occurrence." Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 68–69 (3d ed.1982) (internal citations omitted). As Professor Wayne LaFave notes in his treatise on Criminal Law, "something more is required than a mere coincidence of time and place." Wayne LaFave, *Criminal Law* 797 (5th ed.2010). Felony murder would not include, for instance, a bank customer who, unaware of a robbery taking place, suffers a fatal heart attack. *Id.* The factors frequently stressed in *res gestae* cases are that the felony and killing be "closely connected in point of time, place and causal relation." *Id.* at 799 n. 95.

tion, even though the General Assembly has divided murder into degrees of culpability for penalty purposes. *State v. Goldsberry*, 419 Md. 100, 136–37, 18 A.3d 836 (2011).

■ We have said that "there must be some nexus between the killing and the underlying felony. Mere coincidence between the underlying felony and the killing is not enough; the conduct causing death must be in furtherance of the design to commit the felony." *Watkins v. State*, 357 Md. 258, 272, 744 A.2d 1 (2000). That is not to say, however, that the killing must occur at the exact same moment as the underlying felony. It is clear from the very language in which the crime is defined—"a criminal homicide committed in the perpetration of or in the attempted perpetration of" a felony—that there need not be a precise confluence in time of the killing and the predicate felony. We therefore reject, as did the Court of Special Appeals, the notion espoused by Petitioner that, once the elements of the predicate felony have been accomplished, any subsequent killing perforce is not felony murder.

■ To the contrary, we have recognized that the crime may continue "beyond completion of the core event." *Sydnor v. State*, 365 Md. 205, 217, 776 A.2d 669 (2001). We said in *Sydnor*, in the context of differentiating felony murder from the circumstances under which the defense of self-defense properly can be invoked:

> It is certainly true that, for some purposes [including felony murder], a robbery (and other crimes as well) is treated as continuing beyond completion of the core event—the forcible taking and asportation of property in the case of robbery, the setting of a fire in the case of arson, [or] the sexual attack in the case of rape or other sexual offenses— to include the felon's escape to a point of safety.

*Id.* at 217–18, 776 A.2d 669. *See also Jackson v. State*, 286 Md. 430, 432–34, 443, 408 A.2d 711 (1979) (holding that two defendants who robbed a jewelry store and kidnapped hostages were guilty of felony murder when an officer accidently killed a hostage because "their behavior established such a

causal relationship with respect to the death as to make them criminally liable"). Likewise, in *Metheny v. State*, 359 Md. 576, 755 A.2d 1088 (2000), we noted (but did not have cause in that case to embrace) that, at least when the intent to commit the felony preceded a killing, "the felony murder doctrine applies when the felony and the homicide are parts of one continuous transaction, closely related in point of time, place and causal connection." *Id.* at 629, 755 A.2d 1088 (quoting *Montague v. Commonwealth*, 31 Va.App. 187, 522 S.E.2d 379, 381 (1999), *aff'd*, 260 Va. 697, 536 S.E.2d 910 (2000)). *See also* Maryland Criminal Pattern Jury Instructions 4:17.7 cmt. (2d ed.2012) (noting that a killing falls under the felony murder doctrine if: "[T]he death causing act ... is one that constitutes an immediate accompaniment of the felony and is so closely connected with the felony that it becomes part of it. Although removal from the actual felony, in both time and distance, is relevant, as long as the transaction of the felony is continuous, acts emanating from the felony become a part of it."). We conclude that, at least for those instances when the intent to commit the felony preceded a killing, the felony murder doctrine applies when the felony and the homicide are parts of one continuous transaction and are closely related in point of time, place, and causal connection.[5]

We are not alone in this view. In *Ware v. State*, 259 Ga. 845, 388 S.E.2d 700 (1990), the Supreme Court of Georgia considered a case similar to the one at bar, where a failed drug transaction ended in a killing. Ware attempted to sell cocaine to a man who ran away with the drugs. *Id.* at 700. Giving chase, Ware caught up to the prospective buyer and beat the man. *Id.* Ware's brother soon joined him, shooting the putative buyer twice in an effort to recover the drugs. *Id.* The court found the evidence was sufficient to convict Ware of felony murder, based on the underlying felony of distribution

---

**5.** This does not disturb our holding in *State v. Allen*, 387 Md. 389, 875 A.2d 724 (2005), in which we held that a felony murder conviction requires that "the intent to commit the underlying felony must exist prior to or concurrent with the performance of the act causing the death of the victim." *Id.* at 402, 875 A.2d 724.

of cocaine, and held that the trial court did not err in denying a motion for a directed verdict. *Id.* at 701.

Other courts hold similarly. *See State v. Berry,* 292 Kan. 493, 254 P.3d 1276, 1281 (2011) (felony murder requires that "the death must be within the res gestae of the underlying crime, regardless of the sequence of events leading to the death"); *People v. Gillis,* 474 Mich. 105, 712 N.W.2d 419, 431 (2006) (felony murder occurs when the killing is committed "during the unbroken chain of events surrounding the predicate felony"); *State v. Buggs,* 995 S.W.2d 102, 106 (Tenn.1999) (stating that, at the least, the killing may "coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense so long as there is a connection in time, place, and continuity of action"); *Hylton v. Commonwealth,* 60 Va.App. 50, 723 S.E.2d 628, 629 (2012) (felony murder is limited to a homicide that is "so closely related to the felony in time, place, and causal connection as to make it a part of the same criminal enterprise"). This continuous-transaction approach has the advantage of addressing situations in which a killing is clearly part of an ongoing event stemming from an underlying felony but occurs after the elements of the felony are technically complete. For instance, in the case of a murder caused during the perpetration of arson, the arson is complete "as soon as the criminal had wilfully and maliciously set fire to a dwelling-house ... yet it might be that some human being was in the building at that time, and hours afterwards was consumed in the flames." *Yates,* 202 Md.App. at 714, 33 A.3d 1071 (quoting *Bissot v. State,* 53 Ind. 408, 413 (1876)). A similar argument can be made for a situation where a store owner is killed after a burglar breaks into the store with the intent to steal from the owner. *Id.* The crime of burglary is complete before the actual killing itself occurs.

For all these reasons, we hold that a killing constitutes felony murder when the homicide and the felony are part of a continuous transaction and are closely related in time, place, and causal relation. Applying the law to the facts here, we hold that Worcester's killing occurred during the commission

of the underlying felony of distribution of marijuana. Petitioner came to the drug deal armed, presumably prepared to use violence should it become necessary in the course of the exchange. When Petitioner learned that he had been conned by Kohler and given fake money, he immediately gave chase, brandishing his gun. The jury reasonably could infer from Petitioner's actions that he did not consider the deal complete, and when he ran out of the house he intended, at the very least, to confront Kohler. Shortly after the deal went sour, Petitioner was observed pointing his gun and firing it; gunshots were heard by others who were present for the drug deal. Two of Petitioner's confederates in the deal testified that Petitioner admitted to having fired his gun and that he might have shot Kohler. Had Kohler been shot immediately by Petitioner, instead of being able to flee the house, the link between the two events would be undeniable. The fact that Kohler was able to flee the house and run a short distance before Petitioner shot at him does not change the continuous nature of the event. This was not a shooting unconnected to the drug transaction, or revenge taken days after Kohler's ruse was discovered. It was immediate, directly related to the distribution of marijuana, and so closely connected to that felony that the shooting became a part of it.

The Court of Special Appeals did not err in affirming Petitioner's conviction for second-degree felony murder.

## IV.

Petitioner's final argument rests on the trial court's instruction on second-degree felony murder. The instruction given tracked MPJI–Cr 4:17.7.2B and reads as follows:

In order to convict the Defendants Warren Jerome Yates and Donald S. Kohler of second degree felony murder, the State must prove that the Defendant or another participating in the crime with the Defendant committed or attempted to commit the crime of distribution of marijuana, which is a felony. That the way in which the distribution of marijuana was committed or attempted under all of the circumstances

created a reasonably foreseeable risk of death or a serious physical injury likely to result in death, and that as a result of the way in which the distribution of marijuana was committed or attempted, Shirley Elizabeth Worcester was killed.

Petitioner argues that the trial court erred by not instructing the jury that, in order to convict Petitioner of second-degree felony murder, the jury must find that the killing occurred "during the commission or attempted commission" of the underlying felony, distribution of marijuana. Petitioner concedes that he did not raise this objection at trial. He argues that the Court of Special Appeals abused its discretion by not subjecting the instruction to plain error review. He takes issue with that Court's conclusion that the use of Maryland Criminal Pattern Jury Instructions "weighs heavily" against plain error review.[6]

■ The Court of Special Appeals did not abuse its discretion. In general, a party must object to the failure to give a particular instruction promptly after the instructions are delivered, stating the grounds for the objection. Maryland Rule 4–325(e). This rule of contemporaneous objection applies even to errors of constitutional dimension. *Savoy v. State*, 420 Md. 232, 241-42, 22 A.3d 845 (2011). "An appellate court, on its own initiative or on the suggestion of a party, may, however, take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object." Maryland Rule 4–325(e).

■ Plain error review is reserved for errors that are "compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial." *Savoy*, 420 Md. at 243, 22

---

6. Additionally, Petitioner asks us to undertake a plain error analysis and, in doing so, recognize and correct the intermediate appellate court's error. Petitioner's question before this Court was framed narrowly as to whether the intermediate appellate court abused its discretion in declining to conduct plain error review of the jury instructions. Given the narrow scope of the question, we decline Petitioner's request in his brief to conduct plain error review on our own.

A.3d 845 (2011) (quoting *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035 (1980)). Among the factors the Court considers are "the materiality of the error in the context in which it arose, giving due regard to whether the error was purely technical, the product of conscious design or trial tactics or the result of bald inattention." *Id.* This exercise of discretion to engage in plain error review is "rare." *Id.* at 255, 22 A.3d 845.

 "There is no fixed formula for the determination of when discretion should be exercised, and there are no bright line rules to conclude that discretion has been abused." *Garrett v. State,* 394 Md. 217, 224, 905 A.2d 334 (2006) (alteration in original) (quoting *Jones v. State,* 379 Md. 704, 713, 843 A.2d 778 (2004)). The standard set out in *Garrett* encapsulates the principles guiding our review of the intermediate appellate court's decision:

> [W]e do not reverse the Court of Special Appeals for the exercise of its discretion unless it has clearly been abused. While this Court retains its own independent discretion to hear unpreserved arguments, that does not mean we review the discretionary functions of the lower appellate court *de novo.* To the contrary, we respect the judgment of the Court of Special Appeals in determining whether it needed to consider the issue for the proper execution of justice, and unless upon our review that court abused its discretion under the Rule, we will not substitute our judgment for theirs.

*Id.* (internal citation omitted) (quoting *Jones,* 379 Md. at 715, 843 A.2d 778).

The Court of Special Appeals did not decline review in a cursory fashion. In deciding whether to exercise its discretion, the Court pointed out that the trial court used a pattern jury instruction; cited past appellate decisions approving of the use of pattern instructions; noted that Petitioner could not cite any Maryland cases in which appellate courts have held that a trial court committed plain error in "giving, without objection, a pattern jury instruction"; and observed that

appellate courts outside of Maryland have considered the use of pattern instructions in deciding whether to conduct a plain error review. *Yates,* 202 Md.App. at 722–24, 33 A.3d 1071.

The plain error standard gives a reviewing court a great deal of latitude to decide whether to exercise its discretion. The Court of Special Appeals gave appropriate weight to the use of pattern jury instructions and noted the lack of any authority to support Petitioner's claim of error. There is nothing to suggest that the Court of Special Appeals abused its discretion by declining to conduct a plain error review.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**